# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

NORM DETRICK, et al.,

        Plaintiff,

        -vs-

KCS INTERNATIONAL INC., et al.,

        Defendants.

Case No. 5:24-cv-1154

JUDGE PAMELA A. BARKER

MEMORANDUM OPINION & ORDER

Currently pending are (1) the Joint Motion to Dismiss of Defendants Cruisers Yachts – KCS International Inc. d/b/a Cruisers Yachts ("Cruisers"), Skipper Marine of Ohio, LLC d/b/a SkipperBud's ("SkipperBud's"), Mark Pedersen ("Pedersen"), Dan Zenz ("Zenz"), Todd Riepe ("Riepe"), and John Ferfecki ("Ferfecki") (together, the "Cruisers-SkipperBud's Defendants") (the "Joint Motion") (Doc. No. 27), brought pursuant to Fed. R. Civ. P. 12(b)(6) and filed on September 9, 2024; (2) the Motion for Judgment on the Pleadings of Defendant Discovery Energy, LLC, as successor in interest of Kohler Co. ("Kohler") (the "Kohler Motion") (Doc. No. 36), brought pursuant to Fed. R. Civ. P. 12(c) and filed on October 11, 2024; and (3) the Motion to Dismiss of Jet Thruster Marine, LLC d/b/a Jet Thruster North America ("Jet Thruster") ("Jet Thruster's Motion") (Doc. No. 54), brought pursuant to Fed. R. Civ. P. 12(b)(6) and filed on December 20, 2024.

On October 9, 2024, Plaintiffs Norm Detrick and Judy Detrick (together, the "Detricks" or "Plaintiffs") filed a Brief in Opposition to the Joint Motion.  (Doc. No. 35.)  On October 23, 2024, the Cruisers-SkipperBud's Defendants filed a Reply Brief in support of their Joint Motion. (Doc. No. 40.)  On December 6, 2024, the Detricks filed a Brief in Opposition to the Kohler Motion.  (Doc. No.

45.)  On December 24, Kohler filed a Reply  in support of the Kohler Motion  (Doc. No. 55.)  On

January 21, 2024, the Detricks filed a Brief in Opposition to Jet Thruster's Motion.  (Doc. No. 56.)

For the following reasons, the Joint Motion of the Cruisers-SkipperBud's Defendants (Doc. No.

27) is GRANTED in part and DENIED in part; the Kohler Motion (Doc. No. 36) is GRANTED; and

Jet Thruster's Motion (Doc. No. 54) is DENIED.

## I.  Background

The Complaint sets forth the following allegations.[1]

### A.  Relevant Factual Allegations

#### 1.  The Detricks' "Dream" of Traveling the Great Loop

"In 2021," the Detricks "decided to purchase a new yacht in order to pursue their dream and

adventure of traveling the Great Loop."  (Compl. at ¶ 15.)  The "Great Loop" is a "series of continuous

waterways extending approximately 6,000 miles and [it] includes several of the Great Lakes, the Erie

Canal, the Hudson River, the Atlantic coast of the eastern United States, the Gulf of Mexico, and the

Mississippi River."  (*Id.* at ¶ 16.)  "The Great Loop adventure was of great personal importance to

the Detricks—they planned for it to be the trip of a lifetime—and there were significant hurdles

related to timing, personal health, and managing business responsibilities, and thus the Detricks

sought a manufacturer and seller that could deliver the vessel on the specific timeline they needed."

(*Id.* at ¶ 24.)

---

[1] For purposes of this Opinion, in setting forth the background relevant to the pending motions, the Court accepts the
Detricks' factual allegations as true and construes their Complaint in the light most favorable to them as the non-moving
parties.  *See Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).

To pursue that "dream," the Detricks "sought a vessel that would be well-suited to this adventure, with the ability to safely and reliably navigate the Great Loop waterways (including fresh water lakes and rivers, and salt water ocean and gulf), travel with speed, and have excellent fuel range, in order to meet the demands of traveling long distances without frequent stops." (*Id.* at ¶ 17.) Further, they "sought a vessel that would have the highest levels of functionality and comfort, both because they would be living in the vessel for extended periods of time and because of significant personal health issues that require climate control and other specific amenities[,]" "a reliable generator system, designed for use underway with a proven track record of dependability, in order to consistently operate air conditioners and refrigerators that are essential to managing Judy Detrick's health condition (multiple sclerosis), particularly in warm weather climates of southern segments of the Great Loop[,]" and "the highest levels" of "luxury[,]" "beauty[,]" "quality[,]" and "dependability." (*Id.* at ¶18-21.) Additionally, they "sought a seaworthy vessel with the highest quality in order to meet the demands of being on the ocean and other waterways for substantial periods of time[.]" (*Id.* at ¶ 22.)

### 2. The Detricks' Initial Discussions with Cruisers and SkipperBud's Regarding the 54 Fly

To build the yacht described above, the Detricks "sought a manufacturer and seller to provide the highest levels of support, and act as partners and advisors during the Great Loop, and during the remainder of the full ownership experience with the [vessel]." (*Id.* at ¶ 23.) Due to the "significant hurdles" facing the Detricks, they "sought a manufacturer and seller that could deliver the vessel on the specific timeline they needed." (*Id.* at ¶ 24.) The Detricks "began discussing the purchase of a new yacht with SkipperBud's in or around 2020, and discussions continued into 2021 and 2022 with both Cruisers Yachts and SkipperBud's." (*Id.* at ¶ 28.)

3

### i.  The October 2021 Fort Lauderdale International Boat Show

"In October 2021, Norm Detrick attended the Fort Lauderdale International Boat Show to shop for boats in person[.]"  (*Id.* at ¶ 41.)  There, he "communicated" to the Cruiser-SkipperBud's Defendants the  "intended purposes, expectations, and needs" for the vessel and for the Great Loop adventure to the "Promise Team."  (*Id.*)[2]  Also "[i]n October 2021, when Norm Detrick attended the Fort Lauderdale International Boat Show, he asked Cruisers Yachts and SkipperBud's, including SkipperBud's Sales Manager McDonald, if they could provide specific colors for the 54 Fly selected by the Detricks from any of the colors in Cruisers Yachts' color decks."  (*Id.* at ¶ 163.)

In response, "Cruisers Yachts' and SkipperBud's representatives, including SkipperBud's Sales Manager McDonald and Cruisers Yachts' VP Zenz, promised Norm Detrick that they would furnish the 54 Fly with the specific colors selected by the Detricks from any of the colors in Cruisers Yachts' color decks."  (*Id.* at ¶ 165.)  According to the Detricks, "[i]n October 2021, Norm Detrick and Zenz discussed the desired colors, and agreed that the color selection process would occur in 2022, after the Detricks reviewed color samples."  (*Id.* at ¶ 167.)[3]

The Detricks allege that "conversations with Cruisers Yachts' VP Zenz at the 2021 Fort Lauderdale International Boat Show, and Cruisers Yachts' President Pedersen thereafter, touted the

---

[2] The "Promise Team" consists of: "[R]epresentatives from Cruisers Yachts and SkipperBud's, which initially included Dan Zenz, Vice President of Cruisers Yachts; Todd Riepe, Regional Vice President of SkipperBud's; Steve McDonald, Sales Manager of SkipperBud's; and Jonathan Meyer, General Manager and Executive Team member of SkipperBud's; and later Mark Pedersen, President of Cruisers Yachts; and Michael Porreca of Cruisers Yachts."  (*Id.* at ¶ 26.)

[3] The Detricks also allege that "Norm Detrick and SkipperBud's Sales Manager McDonald discussed the desired colors and agreed that there would be a formal sign-off process following the Detricks' review of color samples provided by Cruisers Yachts and SkipperBud's to avoid any misunderstanding about the colors."  However, the Detricks do not allege where and when this specific representation occurred.  (*Id.* at ¶ 166.)

4

54 Cantius Flybridge model as a well-engineered and refined product that had been on the market for years and stood the test of time." (*Id.* at ¶ 30.)

### ii. Pre-Delivery "False or Deceptive" Representations

The Detricks allege that one or more of the Defendants made certain "false or deceptive" representations to the Detricks before the "the Detricks decided to move forward with the purchase of the 54 Fly from SkipperBud's, to be manufactured by Cruisers Yachts." (*Id.* at ¶¶ 48-49.) Specifically, the Detricks allege that the Cruisers-SkipperBud's Defendants "represented and promised" that:

30. The 54 Fly was a "well-engineered and refined product that had been on the market for years and stood the test of time."

31. "[T]hey would provide best dealer support system available in the industry, including a network of support along the entirety of the Great Loop; technicians readily available from Cruisers Yachts, SkipperBud's, and their parent company MarineMax; and other third-party contacts available to provide support as needed."

32. "[T]hey would provide the best manufacturer support in the industry, with a seamless, team-based approach from the manufacturer and its dealership network, leveraging strong professional and personal relationships."

33. "[T]hey would provide best service in the industry, including preferred scheduling, expedited parts ordering, and a direct line to top executives and management as needed[.]"

34. "[T]hey would provide the best quality control in the industry, including a prebuild meeting with the manufacturing team led by Zenz, personal delivery of the vessel by Zenz, and multiple test-driving sessions over multiple days by SkipperBud's to ensure there were no problems or punch list items, and the boat was 'standing tall and/or better than new' upon delivery."

35. "[T]hey possessed the best in-house engineering team in the industry that would provide the highest level of engineering, technology, and refinement[.]"

36. "[T]hey would provide the best technical support in the industry from manufacturer and dealer whenever needed, including anything from routine maintenance to vital,

time-sensitive matters, with a direct line to top management and executives of both companies if necessary."

37. "[T]hey would provide training for the Detricks and [sic] collaborate to identify spare parts, fluids, tools, and supplies for the Great Loop trip[.]"

38. "[T]hey would provide the best overall experience in the industry throughout the sales, build, and ownership phases, including a personalized and streamlined financing process directly overseen by SkipperBud's finance manager, direct access to Cruisers Yachts' brand manager, and the Detricks would be treated like family[.]"

39. "[T]he 54 Fly would provide ease of use and maintenance by an owner/operator, without the need for a professional captain, including clearly labeled components, systems, and electrical wiring within the vessel."

40. "[T]he 54 Fly would provide excellent joystick maneuverability and controllability in close quarters."

43. "[T]he [54 Fly] could travel at top speeds of at least 41.5 miles per hour."

44. "[T]he 54 Fly would have a fuel range of approximately 285.4 nautical miles per tank of fuel."

45. "[T]the 54 Fly would be furnished with the specific colors selected by the Detricks from any of the colors in Cruisers Yachts' color decks."

46. "SkipperBud's would sell [the Detricks] the 54 Fly for a price at or near cost to minimize the impact of depreciation if the Detricks sold it within a few years."

47. "'[T]he 54 Fly would be 'standing tall and/or better than new,' with no defects or punch list items upon delivery."

(Compl. at ¶¶ 30-47.)   According to the Detricks, it was "Cruisers Yachts' and SkipperBud's representations and promises . . . [that] convinced [them] to purchase a Cruisers Yachts' 54 Cantius Flybridge from SkipperBud's rather than other available dealers and manufacturers."  (*Id.* at ¶ 27.)

### 3. Alleged Events Between the October 2021 Fort Lauderdale International Boat Show and July 2022 Delivery of the 54 Fly

"[T]he Detricks decided to move forward with the purchase of the 54 Fly from SkipperBud's, to be manufactured by Cruisers Yachts[.]"   (*Id.* at ¶¶ 48-49).   The Complaint includes some

6

chronological information that the Detricks allege occurred between October 2021 and July 2022. The Complaint sets forth detailed allegations regarding Defendants' "misrepresentations" about the 54 Fly's "specific color selections."  (*Id.* at ¶¶ 163-83.)  According to the Detricks, "Cruisers Yachts and SkipperBud's, intentionally and knowingly misrepresented the availability of the requested colors in order to persuade the Detricks to move forward with the purchase."  (*Id.* at ¶ 181.)

The Detricks attach as Exhibit 1-40 a document they characterize as a "preliminary purchase/retail order form" dated "11/21/2021."  (*Id.* at ¶ 168; Doc. No. 1-40 at PageID# 354.)[4]  The November 2021 Agreement "did not indicate specific colors because it was intended to define pricing and accessories only, and the parties had agreed that color selections would be made once the 2022 color samples were provided by Cruisers Yachts and SkipperBud's."  (Compl. at ¶ 169.)

Later, "[i]n December 2021," SkipperBud's Sales Manager McDonald emailed Norm Detrick advising that  the "[n]ext step is to get the pricing for all the special requests.  Cruisers is supposed to get that to me after the first of the year, and then you will pick out your colors.  You should receive

---

[4] SkipperBud's disputes that this document was merely a "preliminary purchase/retail order form" and asserts instead that it represents the operative contract between SkipperBud's and the Detricks.  (Doc. No. 27 at PageID#s 1187-89.)  The Court will refer to Exhibit 1-40 as the "November 2021 Agreement."  The November 2021 Agreement lists Norm and Judy Detrick as Co-Buyers.  (Doc. No. 1-40 at PageID# 354.)  It specifies the "Boat" as the "2023 Cruisers Yachts 54 Fly" and the "Engine" as a "2023 Volvo D8, 800 IPS, DPS, EVC 600 HP."  (*Id.*)  It shows a "Selling Price" of $1,997,159.00, a "Trade Allowance" of $299,999.00 for trading in a "2019 Four Winns 375 Vista" with a "2019 Mercruiser 6.2LB3JPS Engine," the "Title/Reg/Admin. Fees" as  $995.00, and "Sales Tax" of $118,801.20.  (*Id.*)  Thus, the "Subtotal," after trade-in, fees, and taxes was $1,816,956.20."  (*Id.*)  The November 2021 Agreement additionally indicates a "Down Payment" of $360,000.00 for a "Balance Due" of $1,456,956.20.  (*Id.*)  Under "Factory Options," it provides "See Attached Build Sheet," which is attached to the November 2021 Agreement as a "2022 Cruisers Retail Order Form."  (*Id.* at PageID#s 356-57.)  A typed block of text in the bottom left reads "Deposit will be completed in two phases $180,000 due at signing and $180,000 due seven (7) days after receiving HIN and Motor and Generator Serial Numbers.  If the Detricks are unable to perform under this Contract, they will forfeit $100,000 of their deposit."  (*Id.* at PageID# 354.)  The November 2021 Agreement also includes "New Manufacturer Warranty" under "Warranty Terms."  (*Id.*)  Even though the November 2021 Agreement is dated 11/11/21, Norm Detricks' signature on the November 2021 Agreement reads "11/17/2022."  (Doc. No. 1-40 at PageID# 354)  SkipperBud's did not sign the November 2021 Agreement despite a line for a "Sales Person," and a box underneath that line that reads "This agreement is subject to the terms and conditions on the attached document . . . This agreement is not binding on Seller unless signed by an officer or sales manager of Seller[,]" (*Id.*)  Similarly, Judy Detrick, although listed as co-buyer, did not sign the November 2021 Agreement.  (*Id.*)

the swatches after the first of the year as well.  On Monday, I will follow up with Cruisers on both of these issues." (*Id.* at ¶ 169.)

"Cruisers Yachts commenced building the 54 Fly in or around January 2022[.]" (*Id.* at ¶ 50.) "On January 6, 2022, McDonald informed Norm Detrick that he had left a message with Cruisers Yachts and expected the color samples to arrive the next day," and "[o]n January 7, 2022, the Detricks received fabric samples with no indication of what items they corresponded to but did not receive any color samples." (*Id.* at ¶¶ 170-71.)  "On January 12, 2022, McDonald informed Norm Detrick that [he had] "called and left Dan [Zenz] a message as well as sent him a text" and that he had "also left a message for a couple of people at Cruisers to see what is going on and once [he had heard back [he] [would] let [him] know." (*Id.* at ¶ 172.)  "On January 18, 2022, the remaining color samples arrived." (*Id.* at ¶ 173.)

"On February 26, 2022, Norm Detrick emailed Michael Porreca of Cruisers Yachts, and asked, 'Can you reach out and see if you can get the colors of the 54 Cantius that was at the Fort Lauderdale boat show.'" (*Id.* at ¶ 174.)  "On May 14, 2022, Norm Detrick again emailed Porreca and asked when they could review the remaining color selections for the 54 Fly, including floors, countertops, and sidewalls of the atrium." (*Id.* at ¶ 175.)  Porreca responded: "'As we sit right now we don't have any additional color decisions.  The floor is set to match the cabinets and the walls and counters are standard equipment.  Attached is your original order with all of color choices.'" (*Id.*) On May 15, 2022, Norm Detrick responded that there had been a "huge misunderstanding about color selections," and he "reiterated" both the "prior communications about color selections" and "the agreement to provide the colors seen at the boat show[.]" (*Id.* at ¶ 176.)  Norm Detrick specifically stressed to Porreca "that the color selections had been very important to the Detricks since 'day one.'"

(*Id.*)  According to the Detricks, they "continued to work with Cruisers Yachts and SkipperBud's to obtain the promised color selections, but [Cruisers and SkipperBud's] failed to provide [the promised color selections] upon delivery of the 54 Fly in July 2022." (*Id.* at ¶ 177.)  The Detricks allege that "Cruisers Yachts and SkipperBud's knew that the requested colors were essential to the Detricks' purchase of the 54 Fly[,]" that the Detricks "relied upon the representations of Cruisers Yachts and SkipperBud's regarding the availability of the specific requested colors for the 54 Fly in deciding to move forward with the purchase[,]" and that "[h]ad the Detricks known that the colors would not be available, they would not have signed the preliminary purchase order [i.e., the November 2021 Agreement] or moved forward with the purchase." (*Id.* at ¶¶ 178-80.)

The Complaint also includes some allegations that some Defendants made additional representations at unstated times during a "Build Process" lasting from January 2022, when Cruisers allegedly began building the 54 Fly, through approximately July 25, 2022, when "the Detricks took delivery of the 54 Fly[.]" (*Id.* at ¶¶ 50-59, 60.)  "In June 2022, while the build was in progress and nearing completion, Cruisers Yachts and SkipperBud's, including Cruisers Yachts' President Pedersen, Cruisers Yachts' VP Zenz, and SkipperBud's Regional VP Riepe arranged for the Detricks to visit Cruisers Yachts' factory in Oconto, Wisconsin for a comprehensive tour and meetings with top executives." (*Id.* at ¶ 51.)

According to the Detricks, "[d]uring the Build Process, Cruisers Yachts and SkipperBud's again made the representations and promises to the Detricks described in Complaint paragraphs 27 to 48 [on pages 5-6 of this Opinion]," represented that "the 54 Fly would not need bow and stern

thrusters because it had a joystick system that would operate effectively and safely without such thrusters[,]⁵ and that it "would be salt-water ready."  (*Id.* at ¶¶ 52-53, 56.)

Before the Detricks "took delivery of the 54 Fly on or about July 25, 2022," on July 1, 2022, the Detricks and SkipperBud's executed a document attached to the Complaint as Exhibit 1-42, titled a "Retail Installment Contract and Security Agreement."  (Doc. No. 1-42.)⁶  "The Detricks relied upon Cruisers Yachts' and SkipperBud's representations and promises [made during the Build Process] in taking delivery of the 54 Fly[,]" but those representations "were false and deceptive."  (*Id.* at ¶ 57-59.)  "When the 54 Fly was delivered in July 2022, it did not have the colors requested by the Detricks and promised by Cruisers Yachts and SkipperBud's."  (*Id.* at ¶ 182.)

### 4.  Initial Alleged Defects and Fall 2022 Great Loop Adventure Attempt

The Detricks allege that "[i]mmediately after taking delivery of the 54 Fly, [they] identified numerous material defects, safety concerns, warranty issues, and repair items, and notified Cruisers Yachts and SkipperBud's on August 2 and 3, 2022."  (*Id.* at ¶ 61; Doc. No. 1-1; Doc. No. 1-2.) "[D]uring August, September, and October 2022[,]" "[t]hose defects "rendered [the 54 Fly] unsafe and not seaworthy" and thereby delayed the Great Loop trip."  (*Id.* at ¶ 63.)

#### i.  Jet Thruster's Installation of the Bow and Stern Thrusters

One of the alleged defects concerned the "the 54 Fly's joystick system."  (*Id.* at ¶ 67.)  "The joystick mechanism. . . did not work properly and was exacerbated by the flybridge of the vessel

---

⁵ The Detricks allege that "Cruisers Yachts' VP Zenz specifically" made this representation.  (*Id.* at ¶ 53.)

⁶ The Detricks contend that this document, in contrast to the November 2021 Agreement (Doc. No. 1-40), represents the operative contract between the parties.  (Doc. No. 35 at PageID# 1510.)  The Court refers to Exhibit 1-42 as the "July 2022 Retail Installment Contract."

creating a sail effect." (*Id.* at ¶ 68.)  "In or around August 2022, the Detricks notified Cruisers Yachts and SkipperBud's of the problems with the joystick."  (*Id.* at ¶ 188.)  Therefore, "[i]n or around August and September 2022,[7] the Detricks, with the cooperation and approval of Cruisers Yachts and SkipperBud's, arranged for installation of bow and stern thrusters by Jet Thruster to remedy defects with the 54 Fly's joystick system."  (*Id.* at ¶ 67.)[8]  "SkipperBud's provided a price quote to install the bow and stern thrusters, were unable to accommodate the schedule necessary to complete the installation so that the Detricks could depart for the Great Loop before Erie Canal closures in October 2022."  (*Id.* at ¶ 194.)

Thus, "[t]he Detricks identified a third-party installer that could meet their Great Loop departure timeline."  (*Id.* at ¶ 195.)  "Cruisers Yachts' VP Zenz . . . provided a[n] [engineering] drawing to give to the third party [sic] installer of the thrusters, stating, 'Here is a drawing from engineering on the bow thruster.  If the company has any questions please have them contact Grayson [Cruiser's Engineering Manager]."  (*Id.* at ¶ 197.)  "On August 24, 2022, SkipperBud's GM Meyer forwarded the engineering drawings from Cruisers Yachts to Norm Detrick."  (*Id.* at ¶ 198.)  Those engineering drawings "were subsequently given to Jet Thruster, the company hired by the Detricks to install the bow and stern thrusters."  (*Id.* at ¶ 199.)  "The Detricks entered into a contract with Jet Thruster to install the bow and stern thrusters."  (*Id.* at 202.)  Attached to the Complaint as Exhibit 1-

---

[7] The Complaint narrows the time range in paragraph 204 when the Detricks plead that "[d]uring the installation of the bow and stern thrusters in August 2022, Jet Thruster negligently and unnecessarily drilled a 3-4 inch hole in the hull, below the waterline, that subsequently required repair, which was paid for by the Detricks."  (*Id.* at ¶ 204.)  Additionally, the Invoice is dated August 29, 2022.  (Doc. No. 1-34 at PageID# 331.)

[8] The Detricks allege that "Cruisers Yachts, SkipperBud's, and specifically Cruisers Yachts' VP Zenz, initially responded to the Detricks' concerns by communicating that there was no problem with the joystick system and that thrusters were not necessary to effectively operate the 54 Fly."  (*Id.* at ¶ 189.)

34 is a document the Detricks allege is a true and accurate copy of the Jet Thruster invoice. (*Id.*; Doc. No. 1-34.)

The Detricks allege that Jet Thruster made several mistakes in installing the bow and stern thrusters in August 2022. (*Id.* at ¶¶ 204-08.) They allege that "Jet Thruster did not appropriately staff the installation job, did not complete the installation work, and performed in an unworkmanlike manner, resulting in delays, defects, and additional involvement by SkipperBud's throughout the project." (*Id.* at ¶ 203.) According to the Detricks, "Jet Thruster did not complete the entirety of the installation, including failing to complete substantial portions of the electrical wiring, reinstallation of the shower/gray water pump, repair of leaks related to the front hose flanges, and improperly placed batteries." (*Id.* at ¶¶ 210, 562.) Therefore, "SkipperBud's technicians repaired the defective and malfunctioning components of Jet Thruster's installation" and "performed the portions of the installation not completed by Jet Thruster" and their work was paid for by the Detricks." (*Id.* at ¶¶ 211-12.) The Detricks allege that "[a]t no time before or during the installation did Cruisers Yachts or SkipperBud's recommend against installing the bow and stern thrusters." (*Id.* at ¶ 213.)

### ii. Additional Alleged Defects

"In or around September 2022, the Detricks were operating the 54 Fly in Lake Erie, near Marblehead, Ohio, and ran aground while underway, due to malfunctioning of the Garmin system and autopilot functions caused by defective installation of the systems by Cruisers Yachts." (*Id.* at ¶ 70.) "During August, September, and October 2022, the Detricks provided notice of numerous warranty issues, material defects, and substantial impairments that affected the vessel's safety and value, and caused unusual and excessive maintenance of the 54 Fly." (*Id.* at ¶ 72.) "The Detricks' Great Loop departure had a hard cut-off date in late September 2022 because the Erie Canal locks

12

closed for the season in mid-October 2022," and "Cruisers Yachts' and SkipperBud's failure to timely remedy the 54 Fly's defects and impairments created pressure on the Great Loop departure timeline and threatened the Detricks' enjoyment of the trip . . ."  (*Id.* at ¶¶ 73-74.)  "The Detricks' first Great Look attempt in 2022 was eventually cancelled due to Cruisers Yachts' and SkipperBud's failure to timely make the 54 Fly safe, seaworthy, and ready for the Great Loop," (*Id.* at ¶¶ 75-76.) (*Id.* at ¶ 76.)[9]

### 5. Continued Alleged Defects, Ferfecki's Representations, and the Fall 2023 Great Loop Adventure Attempt

"After the failed first Great Loop attempt, the Detricks placed the 54 Fly in heated storage for the 2022–2023 winter[.]" (*Id.* at ¶ 78.)  However, "the Detricks continued to experience an overwhelming and unreasonable number of problems with the 54 Fly throughout 2022 and 2023[.]" (*Id.* at ¶ 79.)  "In or around December 2022, Cruisers Yachts assigned Director of Customer Service Ferfecki to manage and oversee the work on the 54 Fly and prepare for the second Great Loop attempt[.]" (*Id.* at ¶ 80.)  The Detricks allege that Norm Detrick "provided an updated list of the 54 Fly's warranty and repair items to Cruisers Yachts and SkipperBud's via email and scheduled calls with company representatives." (*Id.* at ¶ 81.)  According to the Detricks, "Ferfecki represented and promised that Cruisers Yachts and SkipperBud's would" do the following: "remedy as soon as possible the warranty issues, material defects, and substantial impairments of the 54 Fly referenced throughout this Complaint[,]" "pay or reimburse the costs and invoices incurred by the Detricks for repairs to the 54 Fly[,]" "pay or reimburse the fuel costs incurred by the Detricks related to testing,

---

[9] Throughout that time (i.e., from "delivery" until "termination of the first Great Loop attempt"), the Detricks allege that "Cruisers Yachts and SkipperBud's continued to make representations and promises as set forth in Complaint paragraphs 17 to 24 and 26 to 47, and that they would remedy the warranty issues, material defects, and substantial impairments of the 54 Fly as soon as possible and within a reasonable amount of time."  (*Id.* at ¶ 77.)

repairs, and malfunctions of the 54 Fly[,]" "compensate the Detricks for wear and tear on the 54 Fly related to or caused by testing, repairs, and malfunctions[,]" "meet with the Detricks in order to address warranty issues, material defects, and substantial impairments[,]" and "provide "technical drawings and information related to the warranty issues." (*Id.* at ¶¶ 527-32.)  However, the Detricks allege that those representations were "false and deceptive." (*Id.* at ¶ 533.)  And the Detricks allege that they "relied on these representations to continue to work with Cruisers Yachts and SkipperBud's in their attempts to remedy the material defects and substantial impairments of the 54 Fly." (*Id.* at ¶ 534.)

The Detricks allege that "the constant state of repair and service forced [them] to spend approximately 2-6 hours every time they used the 54 Fly, to inspect the vessel, identify any incomplete or defective work, and damage causes by technicians, and follow up with Cruisers and SkipperBud's "regarding ongoing and new issues" "nearly every time they used the 54 Fly." (*Id.* at ¶ 85.)

While "Cruisers Yachts and SkipperBud's continued work on the 54 Fly in 2023," the Detricks allege that "the [54 Fly] was not safe or seaworthy in time to depart for the Great Loop in Spring 2023, as numerous material defects and substantial impairments (described herein)[10] affected

---

[10] The "numerous material defects and substantial impairments" are set forth in paragraphs 163 through 545.  The Detricks categorize the alleged defects into the following categories: Specific Color Selections; Joystick; Center of Gravity and Bow Angle; Unlevel Beds; Garmin System; 54 Fly Engines; Kohler Generator; Windshield Wipers; Hull Design and Engineering; Instruments, Sensors, and Gauges; Fuel Gauge; Fuel Burn Computer; Steering Wheel; Defective Door Finishes; Water Filtration System; Swim Platform; Seadek; Ignition System; Caulking and Sealing; Salon Door; Unlevel Appliances; Unlevel Air Conditioning Equipment; Unlevel Surfaces; Refrigerator; Electrical Wiring; Fuse Box, Network Cables, and Electronic Devices; Ceramic Windshield Coating; Propseed Coating ; FLIR Camera; Siren Marine System; Ice Maker; Shower Door; Shower Drain; Electronic Toilet Flush System; Door Seals; Window Seals; Window Coverings; High Gloss Finishes; Solid Surface Countertops; Unsafe Stairs; Cabinet Drawers; Air Conditioning; Anti-Corrosion System; Traveling on Plane; Seakeeper; Flybridge; Stainless Steel; Service and Repair Scheduling and Coordination Failures; Excessive Number of Repairs and Punchlist Items.  (*Id.* at ¶¶ 163-545.)

its safety and value, created unusual and excessive maintenance of the 54 Fly, and persisted without remedy."  (*Id.* at ¶ 87.)

Also "[i]n or around late Spring 2023," Norm Detrick allegedly asked SkipperBud's "to build the Detricks a new boat that met the promises regarding top speed and performance and if that was not possible to do so, to reduce the price of the 54 Fly by the percentage that it failed to live up to the promised speed."  (*Id.* at ¶ 138.)  Sometime "in or around Summer 2023[,]" Norm Detrick made the same request.  (*Id.* at ¶ 139.)  But "Ferfecki ceased providing weekly status update meetings on or about mid-September 2023."  (*Id.* at ¶ 535.)

Then, "[o]n September 26, 2023, Norm Detrick emailed Ferfecki and SkipperBud's GM Meyer and asked them to communicate to the leadership of Cruisers Yachts and SkipperBud's that the 54 Fly would never perform or be dependable as promised and demand that they build a new yacht for him to replace the 54 Fly."  (*Id.* at ¶¶ 138, 140; Doc. No. 1-27 at PageID# 225.)

Despite the alleged defects, "[b]ased on Cruisers Yachts' and SkipperBud's assurances, and the fact that it was the final window of opportunity to travel the Great Loop in 2023, the Detricks embarked on the trip in late September 2023."  (*Id.* at ¶ 99.)  But according to the Detricks, they "were forced to cut short the Great Loop trip in 2023 due to multiple material defects and substantial impairments and because Cruisers Yachts, SkipperBud's, and Ferfecki failed to make the vessel sufficiently safe and seaworthy to complete the journey."  (*Id.* at ¶ 132.)  "On October 5, 2023, Judy Detrick also "asked [the Promise Team] to take the vessel back," but "[a]s of the filing of this Complaint, Cruisers Yachts and SkipperBud's have not provided a new yacht, reduced the price, or taken back the 54 Fly and provided a refund to the Detricks."  (*Id.* at ¶¶ 141-42; Doc. No. 1-28.)

After Judy asked the Promise Team "to take the vessel back," the 54 Fly "was located in Atlantic City, New Jersey" and "in or around October 2023" the 54 Fly was "scheduled to be docked in Hilton Head, South Carolina."  (*Id.* at ¶¶ 143, 145.)  The Detricks further allege that "Cruisers Yachts and SkipperBud's last performed or paid for any warranty or repair work in or around mid-November 2023[.]"  (*Id.* at ¶ 160.)  Since then, "[o]n March 19, 2024, the Detricks traveled from Ohio to South Carolina for vacation and to spend a week on the 54 Fly."  (*Id.* at ¶ 152.)  However, when they experienced more alleged defects, the Detricks emailed Ferfecki that day, and he responded that "we have been instructed by our counsel that we are no longer able to work directly with you.  Any request for warranty or technical assistance will need to be sent through the proper legal channels.  The vessel is still covered underneath the Cruisers Yachts Limited Warranty until sometime in July of this year."  (*Id.* at ¶ 155.)  Nevertheless, on April 2, May 9, and June 10, 2024, the Detricks "provided Cruisers Yachts and SkipperBud's with a list of defects and impairments to be remedied."  (*Id.* at ¶¶ 157, 158, 159.)  The Detricks conclude that "[s]ince the initial build and delivery of the 54 Fly to present, Cruisers Yachts and SkipperBud's repeatedly promised the Detricks a vessel 'standing tall and/or better than new,' but failed to deliver on their promises, made numerous misrepresentations regarding the 54 Fly, and failed to fulfill their warranty responsibilities."  (*Id.* at ¶ 162.)

### 6.  Kohler Generator Allegations

According to the Detricks, the 54 Fly's generator (the "Generator") "was manufactured and warranted by Kohler."  (*Id.* at ¶ 306)  The Detricks attach the alleged warranty (the "Limited Warranty") to the Complaint as Exhibit 1-37.  (Doc. No. 1-37.)  The Detricks allege that "[t]he Kohler generator overheated on at least 40 occasions since delivery of the 54 Fly, causing irreparable damage

to its performance, dependability, and longevity," and that its "impellors had to be replaced at least 10 times." (*Id.* at ¶ 307.)  The Detricks allege that "Cruisers Yachts improperly installed the Kohler generator, including upside placement of the exhaust tube." (*Id.* at ¶ 310.)[11]  The Detricks allege that "Cruisers Yachts, SkipperBud's, and Kohler knew or should have known that the defective and malfunctioning generator system creates a significant health risk to the Detricks, including but not limited to Judy Detrick's health condition." (*Id.* at ¶ 313.)  "The Detricks notified Cruisers Yachts, SkipperBud's, and Kohler regarding the defective and malfunctioning generator on multiple occasions, but they delayed, denied, and failed to remedy the problem, despite their knowledge of the urgency and importance of the issue to Judy Detrick's health." (*Id.* at ¶ 314.)

## II.    Relevant Procedural History

### A.  The Complaint

On July 9, 2024, the Detricks filed their Complaint against the Cruisers-SkipperBud's Defendants, Kohler, and Jet Thruster. (*Id.*)  The Detricks' Complaint sets forth seventeen (17) claims: Negligent Misrepresentation against Cruisers (Count I); Negligent Misrepresentation against Skipper Bud's (Count II); Ohio CSPA violation against Cruisers (Count III); Ohio CSPA violation against SkipperBud's (Count IV); Ohio CSPA violation against Pedersen (Count V); Ohio CSPA violation against Zenz (Count VI); Ohio CSPA violation against Todd Riepe (Count VII); Ohio UCC 2-608 [Ohio Rev. Code §1302.66] - Nonconforming Goods and Revocation of Acceptance against SkipperBud's (Count VIII); Magnuson-Moss Warranty Act [15 U.S.C. § 2301 et seq.] - Breach of Written Warranty against SkipperBud's (Count IX); Magnuson-Moss Warranty Act [15 U.S.C. §

---

[11] The Detricks make several specific allegations regarding the "design" of the Generator, which allegations are analyzed more fully by the Court in its evaluation of the Detricks' breach of written warranty claim against Kohler.

2301 et seq.] - Breach of Implied Warranty of Merchantability against Cruisers (Count X); Magnuson-Moss Warranty Act [15 U.S.C. § 2301 et seq.] - Breach of Implied Warranty of Fitness for a Particular Purpose against Cruisers (Count XI); Magnuson-Moss Warranty Act [15 U.S.C. § 2301 et seq.] - Breach of Implied Warranty of Merchantability against SkipperBud's (Count XII); Magnuson-Moss Warranty Act [15 U.S.C. § 2301 et seq.] - Breach of Implied Warranty of Fitness for a Particular Purpose against SkipperBud's (Count XIII); Magnuson-Moss Warranty Act [15 U.S.C. § 2301 et seq.] - Breach of Written Warranty against Kohler (Count XIV); Ohio CSPA violation against John Ferfecki (Count XV); Breach of Contract against  Jet Thruster (Count XVI); and Breach of Implied Warranty of Workmanlike Performance against Jet Thruster (Count XVII).

The Detricks seek the following relief:

- Revocation of acceptance (as to Defendant SkipperBud's);

- Rescission of the purchase (as to Defendant SkipperBud's);

- Refund of the purchase price (as to Defendants SkipperBud's and Cruisers Yachts);

- Consequential and compensatory damages (as to the Cruisers-SkipperBud's Defendants SkipperBud's and Kohler), including but not limited to diminution in value of the 54 Fly, loss of use of the 54 Fly, repair costs (past and future), expenses incurred as a proximate result of violations of the law, finance charges, emotional distress, and any other damages suffered by the Detricks as a result of the actions and inactions of these Defendants;

- Treble damages for knowing violation of the Ohio Consumer Sales Practices Act as to the Cruisers-SkipperBud's Defendants;

- Reimbursement of payments for work not performed under the contract as to Defendant Jet Thruster;

- Compensatory damages for diminution in value, and other harm, costs, and expenses incurred as a proximate result of unworkmanlike performance as to Defendant Jet Thruster;

18

- Punitive damages (as to Defendants Cruisers Yachts and SkipperBud's);

- Reasonable attorney fees and costs as to the Cruisers-SkipperBud's Defendants; and

- Any other relief the Court deems appropriate.

(Compl. at PageID#s 196-97).

### B. Motions and Briefing

On September 9, 2024, the Cruisers-SkipperBud's Defendants filed their Joint Motion seeking dismissal of Counts I, II, II, IV, V, VI, VII, VIII, X, XI, XII, and XIII of the Complaint under Fed. R. Civ. P. 12(b)(6). (Doc. No. 27.) However, in the Joint Motion, Cruisers does not seek to dismiss Count IX for Breach of Warranty under the Magnuson-Moss Warranty Act. (*Id.*) On September 13, 2024, Cruisers filed its Answer. (Doc. No. 28.) and on October 4, 2024, Kohler filed its Answer. (Doc. No. 29.)[12]

On October 9, 2024, the Detricks filed their Brief in Opposition to the Joint Motion. (Doc. No. 35.) On October 23, 2024, the Cruisers-SkipperBud's Defendants filed their Reply Brief in support of their Joint Motion. (Doc. No. 40.)

On October 11, 2024, Kohler filed its Motion for Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c) seeking judgment in its favor on the Breach of Written Warranty claim against it set forth in Count XIV. (Doc. No. 36.) On December 6, the Detricks filed their Brief in Opposition to Kohler's Motion (Doc. No. 45), to which Kohler filed its Reply Brief in support of its Motion on December 24, 2024. (Doc. No. 55.)

---

[12] Kohler filed an Amended Answer on October 15, 2024. (Doc. No. 37.)

Jet Thruster filed its Motion to Dismiss (Doc. No. 54) on December 20, 2024, and the Detricks filed their Brief in Opposition on January 21, 2025. (Doc. No. 56.) Jet Thruster did not file a Reply Brief.

## III.   Standard of Review

The Cruisers-SkipperBud's Defendants and Jet Thruster move to dismiss the Detricks' claims against them pursuant to Fed. R. Civ. P. 12(b)(6) and Kohler moves to dismiss the Detricks' claim against it pursuant to Fed. R. Civ. P. 12(c). Under Fed. R. Civ. P. 12(b)(6), the court may dismiss a claim where the claimant has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss under this rule, the function of the court is to test the legal sufficiency of the complaint. *See Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). The court must construe the complaint in the light most favorable to plaintiffs, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). However, legal conclusions and unwarranted factual inferences are not entitled to a presumption of truth. *See Twombly*, 550 U.S. at 555; *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (the Court is "not bound to accept as true a legal conclusion couched as a factual allegation.").

Additionally, the Court must read Rule 12(b)(6) in conjunction with Rule 8(a)(2)'s requirement that a plaintiff need only offer "'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555). Although specific facts are not required to meet the basic minimum notice pleading requirements of Rule 8, a complaint must give the defendant fair notice of what the plaintiff's legal claims are and the factual grounds upon which they rest. *See Bassett v. Nat'l Collegiate Ath. Ass'n*,

528 F.3d 426, 437 (6th Cir. 2008).  The plaintiff's obligation to provide the grounds for relief "requires more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555.  Thus, the plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level."  *Id.*

Pursuant to Fed. R. Civ. P. 12(c), "[a]fter the pleadings are closed - but early enough not to delay trial - a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment."  *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal citation and quotation marks omitted).  "The same standard for deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim applies to a Rule 12(c) motion for judgment on the pleadings."  *Thomas v. Amazon.com Servs.*, 462 F. Supp. 3d 828, 832 (N.D. Ohio 2020) (citing *Roth v. Guzman*, 650 F.3d 603, 605 (6th Cir. 2011)).

## IV.  Analysis

### A.  Negligent Misrepresentation Claims Against Cruisers and SkipperBud's

#### 1.  Economic Loss Doctrine

In the Joint Motion, the Cruisers-SkipperBud's Defendants first argue that the Detricks' tort claims alleging negligent misrepresentation against Cruisers and SkipperBud's (Counts I and II) are precluded by the application of Ohio's economic loss doctrine because those claims do not seek recovery for personal injury or injury to other property.  (Doc. No. 27-1 at PageID#s 1177-81.)  The Detricks concede that the authorities are split regarding the applicability of the economic loss doctrine to negligent misrepresentation claims but defend their position by pointing to a more recent case

indicating that the economic loss doctrine does not bar such claims.  (Doc. No. 35 at PageID#s 1496-98.)  The Cruisers-SkipperBud's Defendants, in their Reply, agree that there is a "split of authorities" but point out that the Detricks rest their argument only on an unpublished Southern District of Ohio case, *Nat'l Mulch & Seed, Inc., v. Rexius Forest By-Products, Inc.*, 2007 WL 894833 (S.D. Ohio Mar. 22, 2007), while the Cruisers-SkipperBud's Defendants rely on published cases from the Northern District of Ohio and the Ohio Supreme Court, and an unpublished case from the Northern District of Illinois.  (Doc. No. 40 at PageID#s 1749-50) (citing *Trgo v. Chrysler Corp.*, 34 F. Supp. 2d 581 (N.D. Ohio 1998), *Picker Int'l, Inc. v. Mayo Found.*, 6 F. Supp. 2d 685 (N.D. Ohio 1998), *Chemtrol Adhesives, Inc. v. Amer. Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624 (Ohio 1989), and *Purizer Corp. v. Battelle Mem'l Inst.*, 2002 WL 22014 (N.D. Ill. Jan. 7, 2022)).

The economic loss doctrine "generally prevents recovery in tort of damages for purely economic loss."  *Corporex Dev. & Constr. Mgmt. v. Shook, Inc.*, 835 N.E.2d 701, 704 (Ohio 2005).  "The well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable."  *Id.* (citation omitted).  "In Ohio, the economic loss doctrine has two aspects.  First, it bars a plaintiff from recovering in negligence for purely economic damages.  Second, it prevents a plaintiff from recovering in tort for the conduct of a defendant that violates only a contractual duty rather than any free-standing duty of care."  *Ross v. PennyMac Loan Servs. LLC*, 761 Fed. Appx. 491, 496 (6th Cir. 2019).

Whether the economic loss doctrine bars a claim therefore depends on determining the difference between a contractual duty and a free-standing duty of care.  A defendant breaches a free-standing duty of care where the defendant owes a "separate duty in tort by virtue of a special or

22

fiduciary relationship to a limited class of people." *Benedettini Cabinets, L.P. v. Sherwin-Williams Co.*, 695 F. Supp. 3d 948, 963 (N.D. Ohio 2023) (citing *Corporex*, 835 N.E.2d at 705). A defendant's duty to avoid negligently providing false information for the guidance of others in their business transactions is a separate duty owed in tort. *See Haddon View. Invest. Co. v. Coopers & Lybrand*, 436 N.E.2d 212, 214 n.1 (Ohio 1982) (adopting the Restatement (Second) of Torts § 552 (Am. L. Inst. 1965), titled 'Information Negligently Supplied for the Guidance of Others,' to hold that an "accountant may be held liable by a third party for professional negligence when that third party is a member of a limited class whose reliance on the accountant's representation is specifically foreseen."); *Corporex*, 835 N.E.2d at 705 (citing Restatement (Second) of Torts § 552) (explaining that a defendant breaches a separate duty in tort when "in the course of business, [the defendant] negligently supplies false information, knowing that the recipient either intends to rely on it in business, or knowing that the recipient intends to pass the information on to a foreseen third party or limited class of third persons who intend to rely on it in business."); *see also Long v. Time Ins. Co.*, 572 F. Supp. 2d 907, 912 (S.D. Ohio 2008) (same).

The separate "preexisting tort duty" "not to negligently supply false information to those relying upon it" is "the duty underlying the tort of negligent misrepresentation." *Jones v. Ohio Nat'l Life Ins. Co.*, 2022 WL 1128596 at *9 (S.D. Ohio Apr. 15, 2022). For that reason, the Sixth Circuit and this Court have concluded that under Ohio law, "the economic loss rule does not apply to claims for negligent misrepresentation." *HDM Flugservice GmbH v. Parker Hannifin Corp.*, 332 F.3d 1025, 1032 (6th Cir. 2003) (citing *McCarthy, Lebit, Crystal & Haiman Co. v. First Union Mgmt., Inc.*, 622 N.E.2d 1093, 1105-06 (Ohio App. 8th Dist. 1993)); *Nations Lending Corp. v. Patille*, 2023 WL 5671940 at *8 (N.D. Ohio Aug. 23, 2023) (Barker, J.) ("[N]egligent misrepresentation is an exception

23

to the economic loss doctrine."); *Miller by & through Miller v. Allianz Life Ins. Co. of N. Am.*, 2020 WL 5653548 at *10 (N.D. Ohio Sept. 23, 2020) (Barker, J.) ("An exception to the economic loss doctrine also applies if the plaintiff alleges negligent misrepresentation.").[13]

Moreover, the cases cited by the Cruisers-SkipperBud's Defendants are not persuasive. Their reliance on *Trgo v. Chrysler Corp.*, 34 F. Supp. 2d 581, 595 (N.D. Ohio 1998) to establish that the economic loss doctrine bars negligent misrepresentation claims is misplaced because *Trgo* was applying California law, not Ohio law. *See Trgo*, 44 F. Supp. 2d at 595 (citing *AB Avnet EMG v. Sierra Semiconductor Corp.,* 81 F.3d 167, 1996 WL 134344 at *1 (9th Cir. 1996)). While they also cite to *Chemtrol Adhesives, Inc. v. Amer. Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624, 629-31 (Ohio 1989), that case did not involve a negligent misrepresentation claim. *See generally id.* The Cruisers-SkipperBud's Defendants are correct that this court did allow the economic loss doctrine to bar a plaintiff's negligent misrepresentation claim in *Picker Int'l, Inc. v. Mayo Found.,* 6 F. Supp. 2d 685, 688–89 (N.D. Ohio 1998), but the court in *Picker* unnecessarily extended the economic loss doctrine beyond the two Ohio cases it cited, *Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*, 653 N.E.2d 661 (Ohio 1995) and *Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen. Hosp. Ass'n*, 560 N.E.2d

---

[13] Where the Supreme Court of Ohio has not squarely addressed an issue of Ohio law, the *Erie* doctrine requires this Court to look to Ohio' intermediate state appellate court opinions as persuasive authority to determine Ohio law. *See in re Town Center Flats, LLC*, 855 F.3d 721, 724 (6th Cir. 2017) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)); *LaFleur v. Yardi Sys., Inc.*, 2025 WL 460897 at *13 (N.D. Ohio Feb. 11, 2025) (citing *Fid. Union Tr. Co. v. Field*, 311 U.S. 169, 177-78 (1940)). Opinions by Ohio's intermediate appellate courts significantly bolster this Court's conclusion that Ohio's economic loss doctrine does not bar negligent misrepresentation claims. *See Pham Construction and Co., LLC*, 236 N.E.3d 849, 859 (Ohio App. 5th Dist. 2024) (claims exempt from the economic loss doctrine "may include negligent misrepresentation, breach of fiduciary duty, and conversion."); *Navistar, Inc. v. Dutchmaid Logistics, Inc.*, 171 N.E.3d 851, 861 (Ohio App. 5th Dist. 2021) (same); *Clemens v. Nelson Fin. Grp., Inc.*, 2015 WL 1432604 at *8 (Ohio App. 10th Dist. Mar. 31, 2015) (same); *Potts v. Safeco Ins. Co.*, 2010 WL 1839738 at *3 (Ohio App. 5th Dist. May 3, 2010) ("[T]he economic loss rule does not apply to claims for negligent misrepresentation."); *Universal Contracting Corp. v. Aug*, 2004 WL 3015325 at *3 (Ohio App. 1st Dist. Dec. 30, 2004) ("Responding to modern economic realities, Ohio has recognized one of the exceptions to the economic-loss rule: the tort of negligent misrepresentation as defined in 3 Restatement of the Law 2d, Torts (1965), Section 552.").

206 (Ohio 1999), because neither of those cases applied the economic loss doctrine to bar a negligent misrepresentation claim.

Finally, the Cruisers-SkipperBud's Defendants cite to *Purizer Corp. v. Battelle Mem'l Inst.*, 2002 WL 22014 (N.D. Ill. Jan. 7, 2002), but the court in that case only reached its interpretation of Ohio law based on *Picker*. *See Purizer*, 2002 WL 22014 at *4 (citing *Picker*, 6 F. Supp. 2d at 688-89). Additionally, each case above *predates* the Sixth Circuit's more recent interpretation of Ohio law in *HDM Flugservice GmbH* permitting negligent misrepresentation claims to survive the economic loss doctrine. *See* 332 F.3d at 1032.[14]

Accordingly, the Court concludes that the Detricks' negligent misrepresentation claims against Cruisers and SkipperBud's are not barred by Ohio's economic loss doctrine.

### 2. Mere Puffery

---

[14] The application of Ohio's economic loss doctrine can depend not only on the "type of tort claim at issue[,]" but also "the complexity of the parties." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 684 F. Supp. 2d 942, 949 (N.D. Ohio 2009) (citing *HDM Flugservice GmbH*, 332 F.3d at 1030-32. "In the absence of privity, Ohio law distinguishes between consumers, who may maintain negligence claim[s] for solely economic damages, and commercial buyers, who may not." *Huffman v. Electrolux N. Am., Inc.*, 961 F. Supp. 2d 875, 882 (N.D. Ohio 2013) (citing *Midwest Ford v. C.T. Taylor Co.*, 694 N.E.2d 114, 116-17 (Ohio App. 9th Dist. 1997)). Thus, if a consumer-plaintiff lacks privity with a defendant, the economic loss doctrine does not bar that consumer's negligence claim. *See In re Porsche Cars N. Am., Inc. Plastic Coolant Tubes Prods. Liab. Litig.*, 880 F. Supp. 2d 801, 871 (S.D. Ohio 2012) (quoting *Chemtrol*, 537 N.E.2d at 631) ("'For an ordinary consumer, i.e., one not in privity of contract with the seller or manufacturer against whom recovery is sought, an action in negligence may be an appropriate remedy to protect the consumer's property interests.'") The Detricks are consumers in privity with SkipperBud's, and the Court concludes below that the Detricks have not established privity with Cruisers. Therefore, had the Detricks asserted pure negligence claims against SkipperBud's and Cruisers, the economic loss doctrine would bar the claim against SkipperBud's (because the Detricks are consumers in privity with SkipperBud's), but would not bar the negligence claim against Cruisers (because the Detricks are not in privity with Cruisers). *See id.* In this case, however, the economic loss doctrine does not bar the Detricks' claims against either Defendant due to the *type* of tort claim the Detricks assert. Here, the Detricks assert negligent misrepresentation claims, not negligence claims. Negligent misrepresentation claims are the "type of tort claim" to which the economic loss doctrine does not apply. *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 684 F. Supp. 2d at 949; *see HDM Flugservice GmbH*, 332 F.3d at 1032; *Pham*, 236 N.E.3d at 859. Thus, the status of the Detricks as consumers, and the presence or absence of privity between them and SkipperBud's and Cruisers, does not matter because Ohio law permits the type of claim the Detricks allege, i.e., negligent misrepresentation claims, as that tort is predicated upon a separate legal duty.

The Cruisers-SkipperBud's Defendants next argue that both the negligent misrepresentation claims and the OCSPA claims against them fail because they are based on "mere, unactionable sales puffery." (Doc. No. 27-1 at 1181-82.) Those claims, the Cruisers-SkipperBud's Defendants contend, are based in "generic and unactionable items of alleged misrepresentation" such as "best in industry dealer support," "best in industry manufacturer support," and "best in industry quality control." (*Id.* at PageID#s 1181-82) (cleaned up). The Detricks respond that the Cruisers-SkipperBud's Defendants mischaracterize their allegations as "mere puffery" because "the statements set forth in the Complaint are specific and quantifiable factual representations." (Doc. No. 35 at PageID#s 1499-1502.) The Cruisers-SkipperBud's Defendants reply that "the large majority of the statements that Plaintiffs allege were misrepresented . . . entail highly subjective statements" "distinguishable from specific representations as to the performance of a product which are objective in nature" and propose that the Detricks should "limit their claims to those that are not such puffery" to "streamline the dispute." (*Id.* at PageID# 1750-51.)

Puffery is a defense to negligent misrepresentation claims. *See Milner v. Biggs*, 522 Fed. Appx. 287, 298 (6th Cir. 2013) (citing *Kondrat v. Morris*, 692 N.E.2d 246, 251-52 (1997)) ("With respect to negligent misrepresentation . . . statements of puffery are not actionable under Ohio law."); *Nicholson v. Jayco, Inc.*, 2016 WL 5463215 at *20 (N.D. Ohio Sep. 29, 2016). "Puffery is generally defined as exaggerated blustering or subjective boasting upon which no reasonable consumer would rely." *Davis*, 2012 WL 691757 at *8 (cleaned up); *Outdoor Techs., Inc. v. Vinyl Visions, LLC*, 2006 WL 2849782 at *4 (S.D. Ohio Sept. 29, 2006). Puffery includes "an exaggeration or overstatement expressed in broad, vague and commendatory language" and "advertising the advantages of a product including claims of general superiority." *Davis v. Byers Volvo*, 2012 WL 691757 at *8 (Ohio App.

4th Dist. Feb. 24, 2012) (quoting *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3rd Cir.1993) and *Stiffel Co. v. Westwood Lighting Grp.*, 658 F. Supp. 1103, 1114 (D.N.J. 1987)).

In their Brief in Opposition, the Detricks did, in fact, "streamline the dispute" by pointing to twenty-two (22) representations which they claim do not constitute puffery.  (Doc. No. 35 at PageID#s 1502-04.)  First, they delineate sixteen (16) representations made before the delivery of the 54 Fly that they claim do not constitute puffery.  (Doc. No. 35 at PageID#s 1502-03) (quoting Compl. at ¶¶ 30-47.)  Then, the Detricks point to six (6) post-delivery representations made by the Cruisers-SkipperBud's Defendants that they contend do not constitute puffery.  (Doc. No. 35 at PageID#s 1503-04) (quoting Compl. at ¶¶ 527-32.)

The Cruisers-SkipperBud's Defendants reply with a general assertion that the Complaint is too "convoluted and difficult to follow."  (Doc. No. 40 at PageID# 1750.)  However, upon its review of the twenty-two (22) alleged misrepresentations delineated by the Detricks in their Brief in Opposition, the Court concludes that the allegations set forth in paragraphs 30, 31, 32, 33, 34, 35, 36, 38, 40, and 527 contain mere puffery, and that the allegations in paragraphs 37, 39, 43, 44, 45, 47, 528, 529, 530, 531, and 532 do not contain puffery.[15]

### i.  Allegations That Include Puffery

Paragraph 30 provides an apt illustration of puffery.  The Detricks allege that the Cruisers-SkipperBud's Defendants "touted" the Vessel as "well-engineered," "refined[,]" "on the market for years," and that it has withstood the "test of time."  (Compl. at ¶ 30.)  Those are precisely the kind of "vague statements not subject to verification by proof" that the Sixth Circuit has determined to

---

[15] As set forth below, the allegations in paragraph 34 include both puffery and non-puffery.

constitute puffery. *City of Monroe Emp. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 674 (6th Cir. 2005); *Jordan v. Paccar, Inc.*, 37 F.3d 1181, 1185 (6th Cir. 1994) (applying Ohio law) (explaining that "rock solid" and "strong" amount to puffery).

In paragraph 31, the Detricks allege that the Cruisers-SkipperBud's Defendants represented that they would provide the "best dealer support," a "network of support," technicians who are "readily available," and "other third-party contacts available to provide support as needed." (Compl. at ¶ 31.) Again, it is unclear how the Court could verify those representations because "best," "available," "network," and "support" are too vague. (*Id.*) Paragraph 32 is puffery because the Detricks allege the Cruisers-SkipperBud's Defendants represented that they would provide the "best manufacturer support in the industry," which is an exaggeration and a claim of superiority. (*Id.* at ¶ 32.) The use of the terms "seamless," "team-based approach," and "strong" are also too vague to verify. (*Id.* at ¶ 32.) The representations alleged in paragraph 33 are puffery because the term "best service" is a claim of superiority, and "direct line to top executive" is also too vague to verify. (*Id.* at ¶ 33.) The representations of "preferred scheduling" and "expedited parts ordering" provide no benchmarks for comparison, so 'preferred' and 'expedited' in those representations have no more meaning beyond a general claim of high-quality services. (*Id.*)

Paragraph 34 contains one representation of puffery, but also two allegedly *true* statements and one statement of actionable non-puffery. (*Id.* at ¶ 34.) First, the Detricks allege that they would receive the "best quality control" which is simply a claim of superiority and therefore not actionable. (*Id.*) Second, the Detricks also allege that they would receive a "prebuild meeting with the manufacturing team" and "personal delivery of the vessel by Zenz[,]" but their own Complaint cuts against their assertion that those statements were false. (*Id.*) In other parts of the Complaint, the

Detricks allege that their "decision to purchase the 54 Fly was based on numerous meetings" and "discussions" they had with members of the Promise Team, and that before the 54 Fly was completely built, they had visited the Cruisers factory in "Oconto, Wisconsin for a comprehensive tour and meetings with top executives." (*Id.* at ¶¶ 26, 50-56.) Thus, the representation that the Detricks would receive a prebuild meeting is true because they received multiple meetings before the 54 was completely built.  They also specifically allege that Zenz did personally deliver the 54 Fly: "When the build was complete, Cruisers Yachts VP Zenz personally delivered the 54 Fly from the factory to dealership, as part of Cruisers Yachts's promise and assurance of the highest standards of quality control . . ." (*Id.* at ¶ 57.)  Thus, while the Detricks claim these statements were false misrepresentations, their own Complaint directly contradicts that claim.  (*Id.*)  Third, paragraph 34 includes one allegation of non-puffery in that the Detricks would receive "multiple test-driving sessions over multiple days."  (*Id.*)  Whether or not the Detricks received a test-driving session is readily verifiable and does not exaggerate the quality of a service.  *See Davis*, 2012 WL 691757 at *8.  Thus, paragraph 34 contains both puffery and non-puffery.  (Compl. at ¶ 34.)

In paragraphs 35, 36, and 38, the Detricks repeat their allegations that the Cruisers-SkipperBud's Defendants promised to provide the "best" service.  (*Id.* at ¶ 35 ["best in-house engineering"]; *Id.* at ¶ 36 ["best technical support . . . whenever needed"]; *Id.* at ¶ 38 ["best overall experience"]; *Id.* [a "streamlined" financing process].)  As explained above, "best" indicates merely a "claim of general superiority," and "streamlined" is simply subjective boasting, so those representations are not actionable.  *Davis*, 2012 WL 691757 at *8.  In paragraph 38, the Detricks additionally allege that the Cruisers-SkipperBud's Defendants represented that the Detricks "would

be treated like family" (Compl. at ¶ 38), but that is a prime example of "subjective boasting upon which no reasonable consumer would rely." *Davis*, 2012 WL 691757 at *8.

Finally, paragraph 527 is puffery because it contains only a representation that the Cruisers-SkipperBud's Defendants would remedy the 54 Fly's defects "as soon as possible," which is not specific and is merely advertising the advantages of the Cruisers-SkipperBud's Defendants' services. (Compl. at ¶ 527.)

### ii. Allegations That Do Not Include Puffery

The Court concludes that the allegations set forth in paragraphs 37, 39, 43, 44, 45, 47, 528, 529, 530, 531, and 532, are not puffery, and that therefore the Cruisers-SkipperBud's Defendants' puffery defense fails as to these allegations.

The allegation in paragraph 37 is not puffery because providing training to identify specific components of the 54 Fly, such as spare parts, tools, and supplies, is not an exaggeration or an overly broad use of any of those terms. (Compl. at ¶ 37.) The allegation in paragraph 39 is not puffery because the usability of the 54 Fly without a professional captain and the presence of "labeled components, systems, and electrical wiring" are verifiable, specific claims. (*Id.* at ¶ 39.) The allegations in paragraphs 43 and 44 are highly specific because they reference a precise speed (41.5 miles per hour) and range (285.4 nautical miles per tank of fuel), both of which are verifiable. (*Id.* at ¶¶ 43, 44.) Those alleged misrepresentations are analogous to the allegations in *Abele v. Bayliner Marine Corp.*, 11. F. Supp. 2d 955 (N.D. Ohio 1997), where the court held that the defendant's alleged representations "that the boat would go faster than 40 mph" was not puffery under the OCSPA. 11 F. Supp. 2d at 964. Likewise, the allegation in paragraph 45 is not puffery because representing that the color of the 54 Fly would be one color and then furnishing a different color is neither an

exaggeration nor vague because the color of the 54 Fly could be objectively determined.  (*Id.* at ¶ 45.)  As to the allegations in paragraph 47, the alleged misrepresentation "standing tall and/or better than new" is puffery, but the alleged misrepresentation that there will be "no defects or punch list items upon delivery" is not puffery.  (*Id.* at ¶ 47.)  The latter allegation is analogous to the representation at issue in *Barksdale v. Van's Auto Sales, Inc.*, 577 N.E.2d 426 (Ohio App. 8th Dist. 1989), where the court held that the defendant's representation that "the transmission was in good working order and that nothing is wrong with it" was not puffery, because both representations expressed that the product was free of flaws.  577 N.E.2d at 728.

The allegations in paragraphs 528 through 532 are also not puffery because they are not characterizations of the 54 Fly, let alone subjective boasting: Paragraphs 528, 529, and 530 set forth alleged specific promises to "pay or reimburse" or "compensate" the Detricks for repairing specific alleged defects.  (Compl. at ¶¶ 528-30.)  Paragraph 531 sets forth an alleged promise to hold a meeting to address the Detricks' concerns with the warranty and the 54 Fly's alleged defects.  (*Id.* at ¶ 531.)  None of those constitute puffery because promising to hold a meeting to address customer concerns is not "exaggerated blustering or subjective boasting" about the superiority of the 54 Fly or the service Cruisers and SkipperBud's would provide, but an ordinary representation to discuss potential defects in a product after a consumer has directed a seller's attention to them.  *Davis*, 2012 WL 691757 at *8.  Finally, the allegation in paragraph 532 is the *opposite* of puffery.  Rather than a vague exaggeration, it is a highly specific promise to provide the technical drawings for a complex product—in this case, a nearly $2 million custom-built yacht—that allegedly malfunctioned.  (Compl. at ¶ 532; Doc. No. 1-40 at PageID# 354.)

Thus, the Cruisers-SkipperBud's Defendants' puffery defense does not cover every representation made by Cruisers and SkipperBud's. Therefore, the Court concludes that the Detricks' negligent misrepresentation claims against Cruisers Yachts and SkipperBud's should not be dismissed on that basis.

Accordingly, because Ohio's economic loss doctrine does not bar negligent misrepresentation claims, and because the mere puffery defense does not apply to all of the Detricks' alleged misrepresentations, the Court declines to dismiss the Detricks' negligent misrepresentation claims against Cruisers and SkipperBud's (Counts I and II).

**B. Application of Fed. R. Civ. P. 9(b) to the Detricks' OCSPA Claims**

The Cruisers-SkipperBud's Defendants also assert that the Detricks' OCPSA claims do not satisfy Fed. R. Civ. P. 9(b)'s heightened pleading standard requirement for fraud-based claims. (Doc. No. 27 at PageID#s 1188-90.) They insist that the allegations are "wholly vague and absent any details that put [them] on notice" because the allegations "provide no information regarding the time, place, and substance of the alleged fraud, or who engaged in them" and that the Detricks therefore failed to adequately plead their claims because they "largely conflat[ed] the [Joint] Defendants and lump[ed] parties together." (*Id.* at PageID# 1188-89.) The Detricks contend that Fed. R. Civ. P. 9(b)'s heightened pleading requirement does not apply to OSCPA claims for two reasons. Citing two unpublished opinions from the Southern District of Ohio, the Detricks argue that Rule 9(b) does not apply because the OCSPA is designed to protect consumers and should be construed liberally in their favor, and because fraud is not an element of an OCSPA claim. (Doc. No. 35 at PageID#s 1511-12.) In reply, the Cruisers-SkipperBud's Defendants cite caselaw from the Southern District of Ohio where the court applied Fed. R. Civ. P. 9(b) to non-OCSPA claims where, as the Cruisers-

SkipperBud's Defendants put it, the "complaint may ring of fraudulent allegations even in the absence of a strict fraud cause of action."  (Doc. No. 40 at PageID# 1754.)

The OCSPA prohibits suppliers from committing an "unfair or deceptive act or practice" or an "unconscionable act or practice . . . in connection with a consumer transaction."  Ohio Rev. Code §§ 1345.02. and 1345.03.  Under both sections, "such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."  Ohio Rev. Code § 1345.02. and 1345.03.  "'[U]nfair or deceptive consumer sales practices' are defined as those that mislead consumers about the nature of the product they are receiving, while 'unconscionable acts or practices' relate to a supplier manipulating a consumer's understanding of the nature of the transaction at issue."  *Szep v. Gen. Motors LLC*, 491 F. Supp. 3d 280, 297 (N.D. Ohio 2020) (quoting *McKinney v. Bayer Corp.*, 744 F. Supp. 2d 733, 743 (N.D. Ohio 2010)).  Therefore, "[t]o make out a prima facie claim under the OCSPA, a plaintiff must show a material misrepresentation, deceptive act or omission that impacted his decision to purchase the item at issue."  *Temple v. Fleetwood Enterprises, Inc.*, 133 Fed. Appx. 254, 266 (6th Cir. 2005) (citations omitted).

Rule 9(b) provides that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  As noted above, the Parties dispute whether Rule 9(b) applies to OCSPA claims, and if it does, whether the Detricks' allegations are sufficient to meet this standard as applied to their OCSPA claims.  The Court concludes that (1) Rule 9(b) applies to the Detricks' OCSPA claims, and that (2) the Detricks have presented a merely perfunctory argument insufficient to support the adequacy of their claims under Rule 9(b), but that in the alternative, even if they had argued that their claims satisfy Rule 9(b), their OCSPA claims would fail under 9(b) on the merits.

33

1. **Rule 9(b) applies to the Detricks' OCSPA claims because the Detricks' OCSPA claims sound in fraud.**

Even though "[t]he Sixth Circuit has declined to reach the issue, leaving the potential application of Rule 9(b) in the OCSPA context unresolved for now[,]" *Ewalt v. Gatehouse Media Ohio Holdings II, Inc.*, 2021 WL 825978 at *15 (S.D. Ohio Mar. 4, 2021),[16] this Court finds that Rule 9(b) does apply to the Detricks' OCSPA claims for two reasons: (i) Rule 9(b) applies to claims where the elements of the cause of action or the allegations in the complaint sound in fraud; and (ii) the Detricks' OCSPA claims sound in fraud.

### i. Rule 9(b) applies to claims that sound in fraud.

For Rule 9(b) to apply, the claim need only "sound in fraud." *Kolominsky v. Root, Inc.*, 100 F.4th 675, 683 (6th Cir. 2024) ("However, we apply the Rule 9(b) pleading standard to claims that sound in fraud."). Put differently, Rule 9(b) can apply to claims that are not strictly "fraud" claims. The Detricks' two cited cases, *Ewalt* and *Ferron v. Search Cactus, L.L.C.*, 2007 WL 1792332 (S.D. Ohio June 19, 2007) both overlook that critical distinction. (Doc. No. 35 at PageID# 1511-12). In *Ewalt* the court "contemplate[d]" that because the "broad remedial purpose of the [OCSPA]" is to "protect consumers from suppliers who commit deceptive or unconscionable sales practices[,]" Rule

---

[16] The Sixth Circuit has intimated that it generally considers deceptive-business-practices claims under Rule 9(b). In *Greer v. Strange Honey Farm, LLC*, 114 F.4th 605 (6th Cir. 2024), the plaintiff brought four claims for alleged violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, the North Carolina Unfair and Deceptive Trade Practices Act, the Florida Uniform Deceptive and Unfair Trade Practices Act, and the Virginia Consumer Protection Act. *See id.* at 610. The Court commented that in addition to Rule 9(b)'s application to the fraud claims, "Rule 9(b) applies to plaintiffs' other claims under the various state deceptive-business-practices statutes as well." *Id.* at 614 n.1 (citations omitted). Moreover, the Sixth Circuit has applied Rule 9(b) to Tennessee's Consumer Practices Act. *See Langer v. BMW of N. Am., LLC*, 533 F. Supp. 3d 626, 636 n.5 (E.D. Tenn. 2021) (quoting *Metro. Prop. & Cas. Ins. Co. v. Bell*, 2005 WL 1993446 at *5 (6th Cir. Aug. 17, 2005)) ("Because allegations of fraud must be pleaded with specificity, see, e.g., Fed. R. Civ. P. 9(b), because that requirement applies to allegations of unfair and deceptive acts under § 47-18-109 and because the plaintiff has not satisfied this pleading requirement, this claim also fails as a matter of law.") (alterations omitted). While not dispositive here, those authorities suggest that the Sixth Circuit would apply Rule 9(b) to the OCSPA were it to address the issue because the OCSPA is also a deceptive-business-practices statute.

9(b) does not apply.  *Id.* at *16.  And "as a remedial act, it is construed liberally in favor of the consumer."  *Id.*  In *Search Cactus*, the court underscored the absence of the word "fraud" from the OCSPA:

> Defendants are incorrect that Plaintiff has to comply with [Rule 9(b)].  Put simply, if a plaintiff does not allege fraud, that plaintiff is not bound by a rule governing fraud allegations.  As Plaintiff rightly notes, 'nowhere within the Third Amended Complaint does the word 'fraud' ever appear.'  Plaintiff is alleging violations of the OCSPA, not fraud.  And fraud is not an element needed to establish a violation of the OCSPA.  As its language makes plain, the statute is focused on 'unfair,' 'deceptive,' or 'unconscionable' consumer sales practices.  Similarly to Plaintiff's complaint, the word 'fraud' is nowhere to be found in the statute.  Requiring Plaintiff to follow Rule 9(b), therefore, is both irrelevant and unnecessary.

*Search Cactus*, 2007 WL 1792332 at *4 (internal citations omitted).

However, the Court is more persuaded by the contrary line of authority from other district courts within the Sixth Circuit.  *See Scheetz v. Consumer Rsch. Corp.*, 2008 WL 11350242 at *3 (S.D. Ohio 2008) (applying Black's Law Dictionary to conclude that "Rule 9(b) applies regardless of whether the OCSPA uses the word 'fraud.'"); *Ferron v. SubscriberBase Holdings, Inc.*, 2009 WL 650731 at *5 n.1 (S.D. Ohio Mar. 11, 2009) (citing *Ferron v. Zoomego, Inc.*, 2007 WL 1974946 (S.D. Ohio. July 3, 2007), *aff'd*, 276 Fed. Appx. 473 (6th Cir. 2008)) ("Rule 9(b) applies in cases such as this because actions for deceptive trade practices are, at their core, fraud claims."); *Polinsky v. Community Health Partners Regional Healthy Sys.*, 858 F. Supp. 2d 891, 901 (N.D. Ohio 2012) (noting the "split in case law regarding whether one must comply with the particularity requirement of Rule 9(b) in pleading claims arising under the OCSPA.").  Thus, the Detricks' reliance on *Ewalt* and *Search Cactus* is misplaced because "fraud" as the term is used in Rule 9(b) has a broader meaning under federal law than *Ewalt*'s and *Search Cactus*'s interpretations acknowledge.

The elements of the cause of action are a strong indicator of when to apply Rule 9(b).  In *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, Inc., 683 F.3d 239 (6th Cir. 2012), the court applied Rule 9(b) to the plaintiff's negligent misrepresentation claim under Kentucky law.  *See id.* at 248.  In support thereof, the court highlighted the following element for such a cause of action: "To plead negligent misrepresentation under Kentucky law, a plaintiff must allege, inter alia, that the defendant 'supplie[d] false information for the guidance of others in [a] business transaction."  *Id.* (citation omitted).  The court then noted that "this element, plainly understood, requires an allegation of duplicity."  *Id.*  An allegation of "duplicity," the court reasoned, "implicates Rule 9(b)'s 'purpose to alert defendants as to the particulars of their alleged misconduct so that they may respond, to prevent fishing expeditions, to protect defendants' reputations from allegations of fraud, and to narrow potentially wide-ranging discovery to relevant matters.'"  *Id.* (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011)) (cleaned up).  Thus, the court concluded that "we believe that [the plaintiff's] negligent-misrepresentation claims, like the rest of its allegations, must satisfy Rule 9(b)'s heightened pleading standard to survive dismissal."  *Id.*  The key in *Republic Bank & Tr. Co.* was that the alleged conduct was duplicitous because the "defendant supplied false information," not because the plaintiff asserted a claim for fraud.  *Id.*

The Sixth Circuit recently reached the same result in *Amos v. Lampo Grp., LLC*, 2024 WL 3675601 (6th Cir. Aug. 6, 2024).  There, the court applied Rule 9(b) to a Tennessee statute, Tenn. Code. Ann. § 50-1-102(a)(1), titled "False or Deceptive Representations, False Advertising, False Pretenses."  *Id.* at *6-7.  That statute provides:

> It is unlawful for any person to induce, influence, persuade or engage workers to change from one place to another in this state, or to bring workers of any class or calling into this state to work in any type of labor in this state through or by means of false or deceptive representations, false advertising or false pretenses, concerning the kind and

36

character of the work to be done, or the amount and character of compensation to be paid for the work, or the sanitary or other conditions of the employment, or as to the existence or nonexistence of a strike or other trouble pending between employer and employees, at the time of or prior to the engagement.

Tenn. Code. Ann. § 50-1-102(a)(1).  The court reasoned that "[w]e have never had a case before us that involved this statute—much less discussed it in the context of pleading standards.  But the language of the statute suggests that a claim under it 'sounds in fraud,' and so is subject to Rule 9(b)'s requirements."  *Amos*, 2024 WL 3675601 at *7.

In addition to the elements of the cause of action, the language the plaintiff uses to plead the claim factors into the heightened pleading standard analysis.  In *Kolominsky*, the court applied Rule 9(b) to the plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act of 1933.  *See Kolominsky v. Root, Inc.*, 667 F. Supp. 3d 685, 696-97 (S.D. Ohio 2023), *aff'd*, 100 F.4th 675 (6th Cir. 2024), *cert. dismissed sub nom. Plumbers Loc. 290 Pension Tr. v. Root, Inc.*, 2024 WL 5175815 (U.S. Dec. 18, 2024).   The court reasoned that the "language used in Plaintiff's Amended Complaint—its 'wording and imputations'—is 'classically associated with fraud.'"  *Id.* (quoting *Rombach v. Change*, 355 F.3d 164, 172 (2d Cir. 2004)).   The district court concluded that the "gravamen of [p]laintiff's Amended Complaint sounds in fraud, [so] '[p]laintiffs cannot so facilely put the fraud genie back in the bottle.'"  *Kolominsky*, 667 F. Supp. 3d at 697 (quoting *Local 295/Local 851 IBT Emplr. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp*, 731 F. Supp. 2d 689, 709 (S.D. Ohio 2010)).   It listed  as examples of the plaintiff's allegations that sounded in fraud the following: that "Mr. Timm's roadshow statements were 'misleading;' the Registration Statement contained 'materially false and misleading statements and omissions'; the Registration Statement was 'inaccurate and misleading' and 'untrue'; and Defendants operated a 'fraudulent scheme.'"  *Id.* at 697.

Finally, as the court in *Scheetz* noted, Black's Law Dictionary's provides additional support for interpreting fraud in Rule 9(b) more broadly.  *See* 2008 WL 11350241 at * 2.  Black's Law Dictionary provides four definitions for fraud:

1. A knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment . . .

2. A reckless misrepresentation made without justified belief in its truth to induce another person to act.

3. A tort arising from a knowing or reckless misrepresentation or concealment of material fact made to induce another to act to his or her detriment. Additional elements in a claim for fraud may include reasonable reliance on the misrepresentation and damages resulting from this reliance.

4. Unconscionable dealing; esp., in contract law, the unfair use of the power arising out of the parties' relative positions and resulting in an unconscionable bargain.

Black's Law Dictionary, *Fraud* (12th ed. 2024).  Thus, the presence or absence of the word 'fraud' alone—either as an element of the claim or as language the plaintiff pleads in a complaint—is not dispositive. The inclusion of *other* allegations characterizing a defendant's misrepresentations as "misleading," "materially false and misleading statements and omissions," "inaccurate and misleading," and "untrue," as in *Kolominsky*, 667 F. Supp. 3d at 697, or general allegations that a defendant knowingly made misrepresentations to induce another to act to their detriment can also trigger Rule 9(b).

Accordingly, based on the above authorities, the Court finds that Rule 9(b) applies to claims that sound in fraud even if the claim is not strictly a claim for fraud.

### ii.  The Detricks' OCSPA claims sound in fraud.

Here, the Detricks' allegations sound in fraud even though the allegations in the Complaint do not use the word "fraud."  Each of their OCSPA claims replicates the same[17] six allegations against each of the Cruisers-SkipperBud's Defendants:

1. [Defendant] misrepresented and misled the Detricks about the 54 Fly's [sic] including with respect to the following issues[.]

2. In deciding to purchase the 54 Fly, the Detricks relied upon [Defendant's] misrepresentations about the 54 Fly to their detriment.

3. In deciding to continue to work with Cruisers Yachts and SkipperBud's in their attempts to remedy the material defects and substantial impairments of the 54 Fly, the Detricks relied upon [Defendant's] misrepresentations to their detriment.

4. In order to convince the Detricks to purchase the 54 Fly, [Defendant] knowingly committed unconscionable and deceptive acts in misleading the Detricks.

5. In order to convince the Detricks to continue to work with Cruisers Yachts and SkipperBud's in their attempts to remedy the material defects and substantial impairments of the 54 Fly, [Defendant] knowingly committed unconscionable and deceptive acts in misleading the Detricks.

6. As a proximate result of [Defendant's] misrepresentations and unconscionable and deceptive acts, the Detricks suffered damages in an amount to be determined at trial.

(Compl. at ¶¶ 583-88 [Cruisers]; *id*. at ¶¶ 590-95 [SkipperBud's]; *id*. at ¶¶ 597-602 [Pedersen]; *id*. at ¶¶ 604-609 [Zenz]; *id*. at ¶¶ 611-616 [Riepe]; *id*. at ¶¶ 670-73 [Ferfecki].)  These allegations sound in fraud because the Detricks allege that the Cruisers-SkipperBud's Defendants made knowing misrepresentations to convince the Detricks to purchase the 54 Fly (and, in the case of Ferfecki, to continue to work with Cruisers and SkipperBud's to remedy the 54 Fly's material defects), and that

---

[17] The Complaint omits allegations numbered 2 and 4 above against Ferfecki because, as the Detricks acknowledge, he only became involved after the purchase of the 54 Fly.  (Doc. No. 35 at PageID# 1505) (citing Compl. at ¶ 80) ("The Complaint is clear that Ferfecki was not directly involved in the deceptive conduct prior to delivery of the 54 Fly.").  This does not affect the outcome because representations 3 and 5 serve the same purpose, which is to show detrimental reliance on his allegedly false representations.

the Detricks relied upon those misrepresentation to their detriment, proximately resulting in damages. (*See generally id.*)  Thus, in each of the Detricks' OCSPA claims, they have alleged conduct amounting to fraud.

The Detricks phrase their OCSPA claims with the above allegations sounding in fraud because fraud neatly overlaps with the cause of action the OCSPA creates.  A claim under OCSPA requires "a material misrepresentation, deceptive act or omission that impacted [the consumer's] decision to purchase the item at issue," *Temple*, 133 Fed. Appx. at 266, and it also forbids an "unconscionable act" with the same effect.  Ohio Rev. Code. § 1345.02.  Fraud includes a "knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment" and "unconscionable dealing."  Black's Law Dictionary, *Fraud* (12th ed. 2024).  The intersection between those causes of action signals that OCSPA simply makes actionable a fraudulently induced consumer transaction.  Therefore, this Court agrees with the Cruisers-SkipperBud's Defendants (and with the well-reasoned opinion in *SubscriberBase Holdings*) that "actions for deceptive trade practices are, at their core, fraud claims."  2009 WL 650731 at *5 n.1.

Accordingly, because the Detricks' OCSPA claims sound in fraud, and because claims that sound in fraud must be analyzed under Rule 9(b), the Court must analyze the Detricks' OCSPA claims under the heightened pleading standard of Rule 9(b).

### 2. The Detricks' OCSPA claims fail to meet Rule 9(b)'s heightened pleading standard.

To satisfy Rule 9(b)'s heightened pleading standard, "the plaintiff must allege (1) the time, place, and content of the alleged misrepresentation, (2) the fraudulent scheme, (3) the defendant's fraudulent intent, and (4) the resulting injury."  *Wall v. Mich. Rental*, 852 F.3d 492, 496 (6th Cir. 2017); *see also Amos*, 2024 WL 3675601 at *5; *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir.

40

2010); *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir. 1988).  "[A]t a minimum, Rule 9(b) requires that the plaintiff specify the 'who, what, when, where, and how' of the alleged fraud."  *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006).  The "particularity" requirement of Rule 9(b) precludes plaintiffs from "lumping" allegations against multiple defendants together, and it requires them to identify which defendant "made a particular misrepresentation."  *Little Mt. Precision, LLC v. DR Guns, LLC*, 2023 WL1816711 at *10 (N.D Ohio Feb. 8, 2023) ("[T]he complaint improperly lumps the [defendants] together without separating out which [defendants] made a particular misrepresentation."); *Sterling v. Experian Info. Sols., Inc.*, 2021 WL 4310597 at *6 (N.D. Ohio Sept. 22, 2021) (quoting *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990)) ("A complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient to meet Rule 9(b)'s particularity requirements.") (cleaned up); *see also Swartz v. KPMG LLP*, 476 F.3d 756,764-65 (9th Cir. 2007) ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together but 'requires plaintiffs to differentiate their allegations when suing more than one defendant[.]").

The Detricks forfeit this argument in their Brief in Opposition because they make no substantive attempt to explain how their OCSPA claims survive Rule 9(b).  (Doc. No. 25 at PageID# 1512.)  Their entire defense on this dispositive issue is contained in the final paragraph of the analysis in their Brief in Opposition:

> Even assuming Rule 9(b) applies, Defendants [sic] argument is unavailing. As described above, and set forth in the Complaint, Plaintiffs have alleged the substance, timing, location, manner, and source of the deceptive statements of Defendants. Defendants' vague claims about a lack of particularity or specificity are entirely insufficient.  Accordingly, Defendants' Motion must be denied as to this argument and Counts III, IV, V, VI, VII, VIII, and XV of the Complaint.

(*Id.* at PageID# 1512) (emphasis added).  The Detricks fail to point to any allegation in the Complaint for any Defendant to explain how it alleges "the substance, timing, location, manner, and source of the deceptive statements of Defendants."  (*Id.*)  In two conclusory sentences, rather than by citation to any specific portion of their Complaint, or to any caselaw, the Detricks merely reference arguments "described above" and "set forth in the Complaint" to attempt to establish the sufficiency of their claims under Rule 9(b)'s heightened pleading requirement.  (*Id.*)  Their argument is "so perfunctory and undeveloped as to be forfeited."  *Tri-Cities Holdings LLC v. Tennessee Admin. Procs. Div.*, 726 Fed. Appx. 298, 309 (6th Cir. 2018).  Indeed, it is well established that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."  *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997); *Gradisher v. City of Akron*, 794 F.3d 574, 586 (6th Cir. 2015) (same).  The Court finds that by failing to provide any meaningful discussion of this issue by citing to any allegation in a 374-page Complaint that they claim satisfies Rule 9(b), the Detricks have waived the argument that their claims satisfy Rule 9(b)'s heightened pleading requirement.

Even on the merits, however, the Court is persuaded that the Detricks' OCSPA claims would not meet Rule 9(b)'s pleading standard.  Every allegation the Detricks point to in *other* sections of their Brief in Opposition is insufficient to support a claim that survives Rule 9(b) because they (1) impermissibly lump Defendants together with non-parties and with each other, or (2) fail to adequately specify the time of the alleged misrepresentation.  (Doc. No. 35 at PageID#s 1502-04.)  Additionally, for the one misrepresentation which allegedly took place with sufficient particularity, the Court finds that it constitutes nonactionable puffery under the standard set forth for puffery above.

For example, Paragraph 26 creates several lumping concerns:

> The Detricks' decision to purchase the 54 Fly was based on numerous meetings, discussions, representations, promises, and information provided by representatives from Cruisers Yachts and SkipperBud's, which initially included Dan Zenz, Vice President of Cruisers Yachts; Todd Riepe, Regional Vice President of SkipperBud's; Steve McDonald, Sales Manager of  SkipperBud's; and Jonathan Meyer, General Manager and Executive Team member of SkipperBud's; and later Mark Pedersen, President of Cruisers Yachts; and Michael Porreca of  Cruisers Yachts.

(Compl. at ¶ 26.)  At one level, paragraph 26 lumps together as one "Promise Team" two entities and six individuals associated with one or the other of the two entities: Cruisers, Zenz, Pederson, Porreca, SkipperBud's, Riepe, McDonald, and Meyer.  (*Id.*)  Thus, when using the term "Promise Team," the Detricks fail to specify which of the individuals associated with the two entities made the misrepresentation at issue.  (*Id.*)  From Cruisers, the Detricks lump together Defendant Zenz, Defendant Pedersen, and non-party Porreca.  (*Id.*)  From SkipperBud's, the Detricks lump together Defendant Riepe and non-parties McDonald and Meyer.  (*Id.*)  Therefore, any reference to a misrepresentation made by "Cruisers Yachts" fails to specify who, if any, among Zenz, Pederson, and Porreca made the misrepresentation, and any reference to "SkipperBud's" similarly fails to specify who, if any, among Riepe, McDonald, and Meyer made the misrepresentation.  (*Id.*)

Next, as noted above, the Detricks' highlight sixteen (16) pre-delivery misrepresentations in paragraphs 30 through 47.  (Doc. No. 35 at PageID#s 1502-03) (quoting Compl. at ¶¶ 30-47.)  Except for paragraph 30, which attributes misrepresentations to Zenz and Pedersen, every other allegation lumps Cruisers and SkipperBud's.  (Compl. at ¶ 30; *Id.* at ¶¶ 31-47.)  And except for paragraph 30, none of them include a time.  (*Id.* at ¶ 30; *Id.* at ¶¶ 31-47.)  Therefore, except for paragraph 30, the

43

Detricks fail to point to any pre-delivery misrepresentation that satisfies Rule 9(b) because they fail to allege the required "who" or the "when" or both. [18] *Sanderson*, 447 F.3d at 877.

Paragraph 30, however, cannot serve as the basis for the Detricks' OCSPA claim for a different reason—it alleges puffery.  Paragraph 30 provides as follows:

> The sales materials and information provided to the Detricks by Cruisers Yachts and SkipperBud's, multiple conversations in 2020 and 2021 with SkipperBud's Sales Manager McDonald, SkipperBud's GM Meyer, and SkipperBud's Regional VP Riepe, conversations with Cruisers Yachts' VP Zenz at the 2021 Fort Lauderdale International Boat Show, and Cruisers Yachts' President Pedersen thereafter, *touted the 54 Cantius Flybridge model as a well-engineered and refined product that had been on the market for years and stood the test of time.*

(*Id.* at ¶ 30.)  That allegation is specific enough to satisfy Rule 9(b) because it identifies who made the alleged misrepresentation at a sufficiently specific point in time.  But, for the reasons explained on page 28 of this Opinion, the Court has found that Zenz's alleged representations in this paragraph are nonactionable puffery.  Thus, although this allegation satisfies Rule 9(b), Ohio law does not

---

[18] A separate section of the Complaint, titled "Cruisers Yachts' and SkipperBud's Build and Delivery Process," lumps Cruisers Yachts and SkipperBud's together in every paragraph except for four of them, where it specifies that "VP Zenz specifically represented that. . ." followed by four highly specific representations.  (*Id.* at ¶¶ 53-56.)  However, the Complaint defines that "Build and Delivery Process" as  a seven-month (7) timespan, lasting from January 2022 to July 2022.  (*Id.* at ¶ 50.)  But a seven-month timespan is too broad to satisfy the 'when' requirement under Rule 9(b).  *See, e.g.*, *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) (quoting *Skylon Corp. v. Guilford Mills, Inc.*, 1997 WL 88894 (S.D.N.Y. Mar. 3, 1997)) ("Although Rule 9(b) does not require that a specific date and time always be alleged as to each misrepresentation, several courts have held that simply 'outlining a four-month window during which all of the misrepresentations occurred does not satisfy the pleading standard of rule 9(b).'"); *President Container Grp. 11, LLC v. Systec Corp.*, 467 F. Supp. 3d 158, 165 (S.D.N.Y. 2020) ("Liberally construed, the Complaint implies the timeframe of the representations occurred between October 2016, when Plaintiff approached Defendant, and December 15, 2016, when the contracts were executed—that is, the full pre-contract negotiation period. The Court finds that this time range of several months is insufficient to plead fraud with particularity.") (internal citation omitted); *In re Newbridge Networks Sec. Litig.*, 962 F. Supp. 166, 175 (D.D.C. 1997)("Alleging a time frame of several months, which is all plaintiffs have done[,] does not satisfy Rule 9(b)."); *Hirata Corp. v. J.B. Oxford & Co.*, 193 F.R.D. 589, 598 (S.D. Ind. 2000) ("Hirata cannot expect simply to rest on its broad assertion that the fraud occurred over a period of six months in 1996.").  Therefore, none of the allegations in paragraphs 527 through 532 or in paragraphs 53-56 contain a sufficiently specific time to satisfy Rule 9(b).

recognize Zenz's representations in paragraph 30 as actionable misrepresentations.  *See Jordan*, 37 F.3d at 1185 (holding that "rock solid" and "strong" amount to puffery).

The Brief in Opposition also references six (6) additional post-delivery misrepresentations that the Detricks attribute to Ferfecki.  (Doc. No. 35 at PageID#s 1503-04) (quoting Compl. at ¶¶ 527-32.)  While Paragraph 526 does state that "[i]n or around December 2022, Cruisers Yachts *assigned* Director of Customer Service Ferfecki to manage and oversee the work on the 54 Fly, including a commitment to holding weekly status update meetings and providing regular written updates[,]" the Complaint does *not* specify when Ferfecki made the alleged misrepresentations attributed to him in Paragraphs 527 through 532, only a general allegation regarding the date of his assignment.  (*Id.* at ¶¶ 526-32) (emphasis added).  This too fails to point out when he made the alleged misrepresentations, and therefore fails to satisfy Rule 9(b).

Accordingly, the Court concludes that the Detricks' perfunctory attempt to defend the sufficiency of their OCPSA claims under Rule 9(b) in their Brief in Opposition amounts to waiving the argument.  (Doc. No. 35 at PageID# 1512).  Even assuming arguendo that the arguments were not waived, the Detricks' OCSPA claims against Cruisers Yachts, SkipperBud's, Pedersen, Riepe, and Ferfecki (Counts III, IV, V, VII, and XV) fail to satisfy Rule 9(b), and although the alleged misrepresentation that forms the basis for the OCSPA claim  against Zenz (Count VI) survives the Rule 9(b) challenge, it constitutes nonactionable puffery.  Therefore, the Detricks' OCSPA claims, Counts III, IV, V, VI, VII and XV, are dismissed with prejudice.

### 3. Enforceability of the Merger Clause and Ferfecki's Connection to the Transaction

The Cruisers-SkipperBud's Defendants make two alternative arguments against the Detricks' OCSPA claims.  They argue that the OCSPA claims fail because the November 2021 Agreement

(Doc. No. 1-40) contained an enforceable merger clause that bars the claims. (Doc. No. 35 at PageID#s 1182-83) (citing Doc. No. 1-40 at PageID# 355.) But the Detricks dispute that the merger clause bars every OCSPA claim because Cruisers, Pedersen, Zenz, Riepe, and Ferfecki "were not potentially relevant parties" to the November 2021 Agreement between the Detricks and SkipperBud's, so it could not apply to the Detricks' OCSPA claims against Cruisers Yachts and its employees. (Doc. No. 35 at PageID# 1504.) As to the OCSPA claim against Ferfecki, the Cruisers-SkipperBud's Defendants additionally argue that because he did not contact the Detricks before they received the 54 Fly, "[n]o conduct alleged by Plaintiffs and attributed to John Ferfecki could have had anything to do with contributing to the Plaintiffs' decision to enter the consumer transaction, which renders the OCSPA inapplicable." (Doc. No. 27-1 at PageID#s 1183-84.) The Detricks respond that OCPSA applies even to "unfair or deceptive acts or practices . . . *after* the transaction." (*Id.*)

However, because the Court dismisses the Detricks' OCSPA claims due to the Detricks' forfeiture of that argument and, alternatively, due to their failure to satisfy Rule 9(b), the Court "need not address whether the additional bases for dismissal contested by the parties are applicable." *Hedges v. Stumbo*, 95 F.3d 1152 (6th Cir. 1996); *see also DG Gas, LLC v. TA Franchise Sys. LLC*, 2025 WL 814928 at *16 (N.D. Ohio Mar. 14, 2025) (concluding that the "Court need not address the aforementioned deficiencies [of the plaintiff's contentions] any further" where the court found "a sufficient basis to dismiss [the plaintiff's] claim."); *Yahnke v. Nixon*, 2010 WL 3420650 at *1 (N.D. Ohio Aug. 27, 2010) ("Because the Court finds dismissal warranted on this ground, the Court need not address defendant's alternative arguments for dismissal."); *Alabsi v. City of Cleveland*, 2021 WL 3773325 at *3 (N.D. Ohio Aug. 25, 2021) ("Because the Court finds dismissal of Count I proper

46

based on the City of Cleveland's immunity, it need not address the alternative argument regarding insufficient pleading.").

Accordingly, the Court declines to resolve the issues regarding the enforceability of the merger clause contained in the November 2021 Agreement and the applicability of the OCSPA to Ferfecki's post-transaction representations.

### C.  Ohio UCC 2-608 Revocation Claim Against SkipperBud's

SkipperBud's makes two arguments as to why the Detricks' claim against SkipperBud's for revocation and rescission falls short: (1) the Detricks brought their claims outside of OCSPA's two-year statute of limitations, and (2) the 54 Fly has undergone "*many* substantial changes[.]" (Doc. No. 27 at PageID#s 1184-86) (emphasis in original).  The Detricks respond by asserting that (1) they did not bring their revocation claim under OCSPA, but rather under Ohio Rev. Code § 1302.66 (Ohio's codification of UCC 2-608) and (2) SkipperBud's "strays outside the factual allegations of the Complaint" to supports its contention that the 54 Fly had been "heavily used" and "undergone significant changes." (Doc. No. 35 at PageID# 1506-07.)  In its Reply, SkipperBud's argues that the language between the OCSPA and UCC is "nearly identical," and that therefore, what counts as a "reasonable time" and "substantial change in the condition" under cases interpreting the OCSPA should apply to claims under the UCC.  (Doc. No. 40 at PageID# 1752.)  It also reiterates that the Detricks made "extreme changes to and significant use of the Vessel after delivery."  (*Id.*)  The Detricks point to paragraphs 138 through 141 of the complaint as evidence of when they "took steps to communicate revocation[.]"  (Doc. No. 35 at PageID# 1507.)  They argue that "revocation generally does not require formal notice; a clear indication that the buyer wants their money back is

sufficient." (*Id.* at PageID# 1508) (citing *Lanham v. Solar Am. of Cincinnati, Inc.*, 501 N.E.2d 1245, 1248 (Ohio App. 12th Dist. 1986)).[19]

As a threshold matter, the Court agrees that the Detricks asserted their revocation claim under Ohio Rev. Code § 1302.66, Ohio's codification of UCC 2-608, not the OCSPA, Ohio Rev. Code § 1345.09(C)(1). (Compl. at ¶¶ 617-25.) That statute permits a buyer to revoke acceptance of a non-conforming commercial unit whose "nonconformity substantially impairs its value to him" "within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it." Ohio Rev. Code § 1302.66. To validly revoke acceptance under Ohio Rev. Code § 1302.66, the buyer must satisfy two elements: (1) the defect must "substantially impair[] the value of the goods to the buyer," *Abele*, 11 F. Supp. at 961 (N.D. Ohio 1997) (citing Ohio Rev. Code § 1302.66(A)),[20] and (2) "th[e] revocation must occur within a reasonable time after discovery of the nonconformity and before any substantial change in the

---

[19] In its Reply, SkipperBud's challenges the out-of-state caselaw the Detricks cite in their Brief in Opposition purely on the basis that those opinions are predicated on non-Ohio law. (Doc. No. 40 at PageID# 1752.) As a matter of Ohio law, however, that is a mistake. *See* Ohio Rev. Code § 1301.103(A)(3) (Chapter 1302 "of the Revised Code must be liberally construed and applied to promote [its] underlying purposes and policies, which are: . . . to make uniform the law among the various jurisdictions."). The Supreme Court of Ohio consistently relies on the UCC interpretations of other states to construe Ohio's UCC provisions. *See Carrerlie v. Shell Oil Co.*, 902 N.E.2d 1, 5 (Ohio 2009) (quoting *Edward A. Kemmler Mem. Found. v. 691/733 E. Dublin-Granville Rd. Co.*, 584 N.E.2d 695, 699 (Ohio 1992)) ("[I]t is desirable to conform our interpretations of the Uniform Commercial Code to those of our sister states."); *Cheatham I.R.A. v. Huntington Nat'l Bank*, 137 N.E.3d 45, 52 (Ohio 2019) ("We interpret the UCC with an eye toward maintaining uniformity with other states."). Additionally, this Court's role in applying an Ohio statute is to construe it as the Supreme Court of Ohio would. *See Faber v. Ciox Health, LLC*, 944 F.3d 593, 602 (6th Cir. 2019) ("When we construe a state statute, we apply the rules of construction that the state supreme court applies when construing its own statutes."). Therefore, contrary to Skipperbud's assertion, this Court may consider both Ohio and non-Ohio legal opinions to determine whether the Detricks have stated a revocation claim under Ohio Rev. Code § 1302.66.

[20] SkipperBud's does not contest that the Vessel was "substantially impaired" under Ohio Rev. Code § 1302.66(A). Instead, it argues that the Detricks revoked their acceptance too late under Ohio Rev. Code § 1302.66(A) because they did not revoke within a "reasonable time" and because their continued use of the vehicle caused a "substantial change in condition" of the Vessel. *Id.* The Court therefore does not analyze whether the Vessel's alleged non-conformities substantially impaired its value, but only whether the Detricks timely revoked their acceptance.

condition of the goods." *Funk v. Montgomery AMC/Jeep/Renault*, 586 N.E.2d 1113, 1116 (Ohio App. 1st Dist. 1990).

The second element, UCC 2-608(2), therefore specifies two post-delivery time periods[21] critical to any use-after-revocation analysis.  The first is the period between the buyer's "discovery of the non-conformity" and the buyer's notice of revocation to the seller, hereinafter referred to as the 'reasonable time period' because the notice of revocation must come "within a reasonable time." *See* Ohio Rev. Code § 1302.66(B).  The second is the period between the buyer's discovery of the non-conformity and the occurrence of a "substantial change in the condition of the goods which is not caused by [the goods'] own defect[.]" *Id.*  These two time periods run separately because a buyer might provide notice of revocation to the seller within a "reasonable" time and *then* use the goods in such a way that works a "substantial change" to the goods, thereby defeating the buyer's revocation claim.  *See McCullough v. Bill Swad Chrysler-Plymouth, Inc.*, 449 N.E.2d 1289, 1293 (Ohio 1983); *Aluminum Line Products Co. v. Rolls-Royce Motors, Inc.*, 649 N.E.2d 887, 896 (Ohio App. 8th Dist. 1994) (reversing trial court's determination that the buyer's revocation was "neither timely nor done without a substantial change in the vehicle's condition" after analyzing the buyer's "continued use of the vehicle . . . after notice of revocation of acceptance.").  For the following reasons, the Court finds that, taking the allegations in the Complaint as true and construing them in the light most favorable to them, the Detricks revoked both before the 'reasonable time period' elapsed and before a

---

[21] Both time periods raise a question of fact.  *See Funk*, 586 N.E.2d at 1116 ("The determination of . . . reasonable notice of revocation of acceptance is ordinarily a matter left to the trier of fact."); David Frisch, 4 *Lawrence's Anderson on the Uniform Commercial Code* § 2-608:39 (3d. ed. 2024) ("It is ordinarily a question of fact whether . . . the buyer has revoked acceptance within a reasonable time[.]") (collecting cases);  *Leila Hosp. & Health Center v. Xonics Med. Sys., Inc.*, 948 F.2d 271, 276 (6th Cir. 1991) (explaining under Michigan's version of UCC 2-608 that revocation "before any substantial change in the condition of the goods"  is a finding "properly within the purview of the jury's consideration").

'substantial change' to 54 Fly occurred, and therefore, have stated a revocation claim under Ohio Rev. Code §1302.66.

### 1.  The Detricks Revoked Within a Reasonable Time Period

The 'reasonable time period' does not run while the seller attempts to cure the non-conformities.  *See Funk*, 586 N.E.2d at 1116 (citing *Lanham*, 501 N.E.2d at 1248) ("[T]he reasonable time requirement must include the time beyond which the seller is attempting to adjust, or cure, the problem."); *Novacore Techs. v. Gst Communs. Corp.*, 20 F. Supp. 2d 169, 185 (D. Mass. 1998) (quoting *Fortin v. Ox-Bow Marina, Inc.*, 557 N.E.2d 1157, 1663 (Mass. 1990)) ("[M]any courts have held that any delay on the part of the buyer in notification of revocation of acceptance is justified where the buyer is in constant communication with the seller regarding nonconformity of the goods, and the seller makes repeated assurances that the defect or nonconformity will be cured and attempts to do so."); *Sumner v. Fel-Air, Inc.*, 680 P.2d 1109, 1117 (Alaska 1984) ("[A] seller's assurances that a defect will be cured generally extend the time period within which a revocation of acceptance will be considered 'reasonable.'")  In short, it is "clear that when a delay in revocation is attributable to the seller's assurances of cure, the delay will not bar the buyer's remedy."  1 *Commercial Law and Practice Guide* ¶ 8.08 (2024).

The Court finds that the allegations in the Complaint, taken as true, demonstrate that the Detricks revoked before the reasonable time period elapsed.  SkipperBud's argues that the Detricks' revocation period elapsed because they "heavily used the Vessel for over two years" by taking it on journeys through the Great Lakes, to New Jersey and South Carolina.  (Doc. No. 27-1 at PageID# 1185) (citing Compl. at ¶¶ 70, 143, 146, 564.)  The Detricks allege that they "took delivery" of the 54 Fly on July 25, 2022, and that "SkipperBud's last performed or paid for any warranty or repair

work in or around mid-November 2023 . . ." (Compl. at ¶¶ 60, 160.) Thus, the 'reasonable time period' within which the Detricks could revoke acceptance could not have elapsed as a matter of law before mid-November 2023 because before then, SkipperBud's had attempted to cure the non-conformities. *See Funk*, 586 N.E.2d at 1116; *Lanham*, 501 N.E.2d at 1248. While the Detricks do not point to one specific communication representing their revocation of acceptance (Doc. No. 35 at PageID# 1506-09), they do allege that they "took steps to communicate revocation beginning less than one year after delivery of the 54 Fly, for example, as described in paragraphs 138-141 of the Complaint." (Doc. No. 35 at PageID# 1509.) "In or around late Spring 2023," Norm Detrick allegedly asked SkipperBud's "to build the Detricks a new boat that met the promises regarding top speed and performance," and on September 26, 2023, he emailed SkipperBud's General Manager, Meyer, to "demand that they build a new yacht for him to replace the 54 Fly." (Compl. at ¶¶ 138, 140; Doc. No. 1-27 at PageID# 225.) Similarly, on October 5, 2023, Judy Detrick "asked [Cruisers and SkipperBud's] . . . to take the vessel back." (Compl. at ¶ 141; Doc. No. 1-28 at PageID# 226-28.) Therefore, construing those allegations in a light most favorable to the Detricks, i.e., all three communications to SkipperBud's constituted the Detricks' revocation of acceptance, the revocation necessarily occurred *before* SkipperBud's last attempted to cure the 54 Fly's nonconformities in November 2023.

### 2. The Detricks Revoked Before the 54 Fly Substantially Changed

SkipperBud's contends that the Detricks' post-revocation continued use of the 54 Fly substantially changed it. At this stage of the litigation, the Court cannot say that it did. As described above, even after giving the seller notice of revocation, a buyer may use the goods without causing a 'substantial change' that defeats the buyer's revocation. The Supreme Court of Ohio, in *McCullough*

*v. Bill Swad Chrysler-Plymouth, Inc.*, set forth five factors to determine when a buyer's post-revocation use is reasonable:

1. Upon being apprised of the buyer's revocation of his acceptance, what instructions, if any, did the seller tender the buyer concerning return of the now rejected goods?

2. Did the buyer's business needs or personal circumstances compel the continued use?

3. During the period of such use, did the seller persist in assuring the buyer that all nonconformities would be cured or that provisions would otherwise be made to recompense the latter for the dissatisfaction and inconvenience which the defects caused him?

4. Did the seller act in good faith?

5. Was the seller unduly prejudiced by the buyer's continued use?

*Black Bear Energy Servs., Inc. v. Youngstown Pipe & Steel, LLC*, 2020 WL 1286036 at *22 (W.D. Pa. Mar. 18, 2020) (quoting *McCullough*, 449 N.E.2d at 1293); White, Summers, & Hillman, 1 *Uniform Commercial Code* § 9:20 (6th ed. 2024) (same).

SkipperBud's does not evaluate any of these factors.  Instead, SkipperBud's asserts that there were one-hundred and twenty (120) engine hours, four-hundred and nine (409) Sea Keeper hours, and three hundred (300) generator hours  in 2022 and 2023 (Doc. No. 27-1 at PageID# 1185) (citing Doc. No. 1-12 at PageID#s 120; *Id.* at 1-20 at PageID# 138), and that the thrusters were installed. (*Id.* at PageID# 1185).  SkipperBud's cites four cases, *Clayton v. McCary*, 426 F. Supp. 248 (N.D. Ohio 1976), *Davenport v. Score Auto., Inc.*, 1997 WL 746060 (Ohio App. 12th Dist. Dec. 1, 1997), *Frey v. Vin Devers, Inc.*, 608 N.E.2d 796 (Ohio App. 6th Dist. 1992), and *Baker v. TriCounty Harley Davidson, Inc.*, 1999 WL 1037262 (Ohio App. 12th Dist. Nov. 15, 1999), where the court held that the buyer had substantially changed the goods, but none of those cases demonstrate that the

allegations in the Complaint must be construed as amounting to the 'substantial change' necessary to defeat the Detricks' revocation claim.

First, SkipperBud's cites *Clayton* for the proposition that "where a car's engine had been replaced, this was a 'substantial change' in the condition of the vehicle, and therefore, revocation was unavailable." (Doc. No. 27-1 at PageID# 1185.) The full quote reads: "the original engine on the subject automobile had to be replaced and the replacement engine is locked *rendering the automobile inoperable*." *Clayton*, 426 F. Supp. at 262 (emphasis added). Thus, the court relied on the inoperability of the vehicle, not the mere replacement of the engine, to find the "substantial change." *Id.* Yet unlike in *Clayton*, the Complaint omits any allegation that the Detricks replaced a component of the 54 Fly which rendered the 54 Fly "inoperable." 426 F. Supp. at 262. SkipperBud's even concedes as much, highlighting that the 54 Fly *did* operate by noting that the Detricks "have heavily used the 54 Fly for over two years, taking it [on] long journeys . . ." (Doc. No. 27-1 at PageID# 1185.) The inoperability of the vehicle in *Clayton* is not the same as the still operating (but allegedly malfunctioning) 54 Fly in this case.

In *Davenport*, the court held that the buyer's post-revocation use of her vehicle "may have been unreasonable" because she could have "used other vehicles in her household [,]" the seller "acted in good faith[,]" and the buyer's use of the vehicle for an additional 50,000 miles unduly prejudiced the seller. 1997 WL 746060 at *2. Unlike in *Davenport*, however, the Complaint does not disclose any other vessel besides the 54 Fly that the Detricks could have used, and contrary to the seller's good faith in *Davenport*, the Detricks allege that SkipperBud's made "false and deceptive" promises that they would address the 54 Fly's defects. (Compl. at ¶¶ 527-33.) SkipperBud's directs the Court's

attention to the Detrick's use of the vessel, but it fails to connect the Detricks' use to any purported "undue prejudice" against SkipperBud's alleged in the Complaint.

In *Frey*, the court did not distinguish between a revocation "effected within a reasonable time" and a revocation "before a substantial change," and it only noted that revocation was unavailable because the buyers waited "six months" after discovering the defect before attempting to revoke, and by that time "the vehicle had been driven extensively." 608 N.E.2d at 801-02. That court did not mention how *much* driving constituted "extensive driving." Thus, the Court cannot compare, at the pleading stage, the "extensive" driving of a car in *Frey* to the extent of the Detricks' use of the vessel in this case.

In *Baker*, the court found a "substantial change" to the buyer's motorcycle preventing rescission[22] because the buyer waited "two years after discovering that his motorcycle had not been repaired as stated" before even attempting rescission. 1999 WL 1037262 at *2. In contrast, the Complaint shows that the Detricks discovered new defects in the 54 Fly after they "embarked on the [Great Loop] trip in late September 2023[.]" (Compl. at ¶ 99.) Specifically, SkipperBud's "modif[ied] the shape of the 54 Fly's hull, to remedy the vessel's underperformance and overheating, which took at least 10 attempts and multiple months of an archaic process of trial and error to complete." (*Id.* at ¶ 91.) Then, SkipperBud's GM, Meyer, conducted a test drive with the "Garmin system" and "Meyer assured [Norm Detrick] it was working properly." (*Id.* at ¶ 97.) For instance, during the Great Loop trip in 2023, the Detricks discovered that components of 54 Fly lacked

---

[22] *See Aluminum Line Prod. Co. v. Rolls-Royce Motors, Inc.*, 613 N.E.2d 990, 993 (Ohio 1993) (explaining that the Ohio's adoption of the UCC 2-608 through Ohio Rev. Code § 1302.66 replaced the "equitable remedy of rescission" with the "distinct court of action known as revocation of acceptance[.]"). Thus, under Ohio Rev. Code. § 1302.66, "rescission" and "revocation" are not distinct. *See id.* (noting that "several jurisdictions have followed the trend of displacing the concept of rescission with a more inclusive provision allowing revocation of acceptance.").

"necessary protective coatings," the "engines and generator overheat[ed,]" and the "refrigerator failed and had to be replaced[.]" (*Id.* at ¶¶ 105-06.) As noted above, Norm Detrick attempted revocation on September 26, 2023 (Doc. No. 1-27 at PageID# 225), and Judy attempted revocation on October 4, 2023, both of which are shortly after they began the Great Loop trip in "late September 2023[,]" (Compl. at ¶¶ 99, 140-41.) Thus, unlike the "two years" between the discovery and the buyer's attempted revocation in *Baker*, the Detricks attempted revocation soon after discovering additional defects.

Upon its own evaluation of the *McCullough* factors, the Court concludes that the Detricks have stated a revocation claim sufficient to withstand dismissal at this stage.

As to the first factor, the Complaint does not allege that SkipperBud's provided any instructions to return the 54 Fly following the Detricks' revocation in late September/early October 2023, which cuts in favor of the buyer's continued use. *See Aluminum Line Prods. Co.*, 649 N.E.2d at 891 (citing *McCullough*, 449 N.E.2d at 1293) (noting that in *McCullough*, "the buyer was entitled to retain possession of the vehicle, since [the seller] failed to advise her as to how she should return it after she revoked acceptance of the vehicle.").

As to the second factor, which looks at the buyer's "personal circumstances compel[ling] the continued use" of the goods, it also favors the Detricks. *McCullough*, 449 N.E.2d at 1293. The Complaint indicates that Judy Detrick suffers from multiple sclerosis (Compl. at ¶¶ 19, 312), that she "recently battled cancer," and that the purpose of the 54 Fly is to "fulfill a dream of [the Detricks] to do the Great American Loop [] worry free while [Judy] ha[s] [her] health." (Doc. No. 1-28 at PageID# 226.) Her purportedly deteriorating health condition, therefore, suggests at least some time constraint to using the 54 Fly, the reasonableness of which this Court cannot weigh at the pleading the stage.

The third factor looks to whether the seller "assure[d] the buyer that all nonconformities would be cured" or that the buyer would be compensated for defects during buyer's post-revocation use. *McCullough*, 449 N.E.2d at 1293.  This factor does not favor either party.  The Complaint shows that after he was assigned by Cruisers to work with the Detricks in September 2022, Ferfecki had "represented and promised that Cruisers Yachts and SkipperBud's would pay or reimburse the costs and invoices incurred by the Detricks for repairs to the 54 Fly." (Compl. at ¶ 528.)  Then, even five (5) months *after* SkipperBud's began refusing "to perform any warranty or repair work on the 54 Fly" "around mid-November 2023[,]" (Compl. at ¶ 161), on March 19, 2024, the Detricks nevertheless "traveled from Ohio to South Carolina for vacation and to spend a week on the 54 Fly." (Compl. at ¶ 151.)  That very same day, Ferfecki (a representative from Cruisers, not SkipperBud's) informed the Detricks that "we have been instructed by our counsel that we are no longer be able to work directly with you.  Any request for warranty or technical assistance will need to be sent through the proper legal channels. *The Vessel is still covered underneath the Cruisers Yachts Limited Warranty until sometime in July of this Year*." (*Id.* at ¶ 155) (emphasis added).  So, while the Detricks may have embarked on their vacation on March 19, 2024, the Complaint does not make clear when exactly SkipperBud's stopped assuring them that the nonconformities would be cured, so the Court cannot determine at this stage of the litigation whether this factor favors SkipperBud's or the Detricks.  *See McCullough*, 449 N.E.2d at 1293.

The fourth factor looks to the seller's "good faith," but the Complaint's allegations, taken as true, do not show good-faith conduct.  In *McCullough*, the court explained that "whether [the seller] acted in good faith throughout this episode is highly problematic, especially given the fact that whenever repair of the car was undertaken, new defects often miraculously arose while previous ones

56

frequently went uncorrected." *Id.*  Like in *McCullough*, the Detricks here allege repeated unsuccessful attempts by SkipperBud's to repair the 54 Fly.  For instance, the Detricks allege that the 54 Fly "remained in a constant state of repair and service due to the numerous material defects and substantial impairments that affected the vessel's safety and value, and created unusual and excessive maintenance of the 54 Fly; these problems existed at the time of delivery and persisted through October 2022 and beyond, because Cruisers Yachts and SkipperBud's failed to resolve them within a reasonable amount of time and a reasonable number of attempts." (Compl. at ¶ 75.)  That "constant state of repair[,]" they allege, "created unusual and excessive maintenance of the 54 Fly."  (*Id.* at ¶¶ 135, 161.)    According to the Complaint, "SkipperBud's repeatedly failed to repair or remedy warranty issues within a reasonable number of attempts or reasonable amount of time, including the many issues set forth herein[,]" and SkipperBud's has "abandoned efforts to repair, remedy, or provide support and assistance to the Detricks related to the 54 Fly.  (*Id.* at ¶¶ 553, 559.)  These allegations, taken as true, show the kind of lack of good faith conduct that the court in *McCullough* found warranted continued use after revocation.

Finally, the fifth *McCullough* factor looks to whether the buyer's continued use prejudiced the seller.  *See* 449 N.E.2d at 1292.  SkipperBud's points to no allegations in the Complaint showing a diminution in value of the 54 Fly created by the Detrick's post-revocation use of the 54 Fly to travel from Ohio to South Carolina for their vacation, or from any other post-revocation use.  (Compl. at ¶ 151.)  In fact, each of the usage statistics SkipperBud's relies on in Exhibits 1-12 and 1-20 show *pre*-revocation use: the Detricks logged the four-hundred and nine (409) Sea Keeper hours and one-hundred and twenty (120) engine hours by November 1, 2022 (Doc. No. 1-12 at PageID# 120), and

the three hundred (300) generator hours by June 5, 2023. (Doc. No. 1-20 at PageID# 138). Thus, SkipperBud's has not demonstrated prejudice by the Detrick's post-revocation use.

In summary, the Detricks' alleged revocation occurred while SkipperBud's was still attempting to cure the nonconformities, and four of the five *McCullough* factors weigh in favor of the Detricks. That is insufficient for the Court to withdraw the many open factual questions from the factfinder by determining as a matter of law that the Detricks have failed to state a revocation claim under Ohio Rev. Code. § 1302.66. *See Funk*, 586 N.E.2d at 1116; David Frisch, 4 *Lawrence's Anderson on the Uniform Commercial Code* § 2-608:39 (3d. ed. 2024); *Leila Hosp. & Health Center v. Xonics Med. Sys., Inc.*, 948 F.2d 271, 276 (6th Cir. 1991).

Accordingly, because SkipperBud's has failed to show that the Detricks failed to revoke their acceptance before the 'reasonable time period' elapsed, and before the Detricks caused a 'substantial change' to the 54 Fly, the Court finds that the Detricks have stated a claim for revocation under Ohio Rev. Code § 1302.66 and therefore declines to dismiss Count VIII against SkipperBud's.

### D. Breach of Implied Warranty Claims Against Cruisers and SkipperBud's

#### 1. Lack of Privity Between the Detricks and Cruisers

Cruisers contends that the Detricks cannot maintain breach of implied warranty claims against Cruisers because the Detricks lack privity with Cruisers in that the Detricks purchased the 54 Fly from SkipperBud's.[23] (Doc. No. 27 at PageID# 1186.) In response, the Detricks argue that contractual privity is unnecessary because SkipperBud's was merely an agent of Cruisers, and "the manufacturer is so involved in the sales transaction that the distributor merely becomes the agent of

---

[23] The Joint Motion states that "Counts X, XI, XII, and XIII must fail as to Cruisers" but only Counts X and XI are alleged against Cruisers. (Doc. No. 27 at PageID# 1186.)

the manufacturer."  (Doc. No. 35 at PageID# 1509) (quoting *Bobb Forest Prods. v. Morbark Indus.*, 783 N.E.2d 560, 575-76 (Ohio App. 7th Dist. 2002)).  The Detricks argue that because Cruisers made representations about the 54 Fly's quality and suitability for the Detricks' purposes before the sale and made representations regarding the ongoing problems with the 54 Fly after delivery, there was a "closely intertwined relationship" that created privity.  Cruisers argues that the Detricks raise agency as a new argument in their Brief in Opposition and distinguish *Bobb Forest* by highlighting that the court held the manufacturer liable where "it only produced one product per year, and therefore, the product was created specifically for the customer by the manufacturer."  (Doc. No. 40 at PageID# 1752-53.)

First, the Detricks did not raise the "'agency' exception" to privity before their Brief in Opposition because that brief was their first chance to oppose Cruiser's privity defense.  (Doc. No. 40 at PageID# 1753.)  The Detricks asserted two breach of implied warranty claims against Cruisers Yachts in the Complaint, to which Cruisers raised lack of privity as a defense in the Joint Motion to Dismiss, and then the Detricks disputed the lack of privity by asserting that the Complaint alleges facts sufficient to show an agency relationship.  (Compl. at ¶¶ 633-46; Doc. No. 27-1 at PageID# 1186; Doc. No. 35 at PageID#s 1509-10; Doc. No. 40 at PageID# 1752-53.)  Moreover, Cruisers could (and did) reply to this argument in its Reply, so countering Cruiser's privity defense did not constitute unfair surprise to Cruisers.  (Doc. No. 40 at PageID# 1752-53.)

Second, the Detricks must establish privity against Cruisers to prevail on their breach of implied warranty claims because "Ohio law . . . requires privity for warranty claims."  *Navarro v. P&G*, 515 F. Supp. 3d 718, 744 (S.D. Ohio 2021).  As noted in *Bobb Forest*, a consumer and manufacturer are in privity where the "manufacturer is so involved in the sales transaction that the

distributor becomes merely an agent of the manufacturer." 783 N.E.2d at 576. In turn, "[a]gency is a consensual fiduciary relationship between two persons where the agent has the power to bind the principal by his actions, and the principal has the right to control the actions of the agent." *CIT Grp./Equip. Fin., Inc. v. Brown Cty.*, 25 N.E.3d 473, 477 (Ohio App. 12th Dist. 2014) (quoting *Cincinnati Golf Mgt., Inc. v. Testa*, 971 N.E.2d 929, 933 (Ohio 2012)) (cleaned up). "[T]he test as to whether a person is the agent of another is the right of control of the one over the other." *Ferrell v. Nationwide Mut. Ins. Co.*, 2011 WL 2640263 at *5 (Ohio App. 8th Dist. July 7, 2011) (quoting *Ross v. Burgan*, 126 N.E.2d 592 (Ohio 1955)). "Under Ohio law, the party asserting an agency relationship has the burden of establishing that the agency exists." *Wolper v. Hotel Eur.*, 552 F. Supp. 2d 687, 692 (N.D. Ohio 2008) (citing *Gardner Plumbing, Inc. v. Cottrill*, 338 N.E.2d 757, 759 (Ohio 1975)).

The Detricks point to no allegations in the Complaint that demonstrate that Cruisers controlled SkipperBud's. They only claim that Cruisers "was consistently involved throughout the course of events[,]" but they do not explain how that involvement amounts to control. (Doc. No. 40 at PageID# 1752.) Moreover, the written warranty provided by Cruisers disclaims an agency relationship, providing, "THE SELLING DEALER IS NOT AN AGENT OF CRUISERS YACHTS OR A CO-WARRANTOR AND IS NOT AUTHORIZED TO AMEND OR MODIFY THIS LIMITED WARRANTY IN ANY MANNER." (Doc. No. 1-41 at PageID#366.) Without more, the Detricks have not met their burden to show that an agency relationship existed between Cruisers and SkipperBud's.

Further, in *Bobb Forest*, the court did not ground its holding that privity existed between the manufacturer and the end-user on the existence of an agency relationship between the manufacturer and the distributor, but rather did so based upon its determination that the end-user "was the intended

third-party beneficiary of the sales contract between [the distributor] and [the manufacturer]." 783 N.E.2d at 576. The Detricks, however, only rely on their undeveloped argument regarding agency, and fail to advance any argument regarding whether they were a third-party beneficiary of a contract between SkipperBud's and Cruisers. (Doc. No. 35 at PageID# 1509-10). This Court cannot evaluate an argument a party failed to raise. *See, e.g.*, *Elhady v. Bradley*, 438 F. Supp. 3d 797, 818 n.13 (E.D. Mich. 2020), *rev'd on other grounds*, 18 F.4th 880 (6th Cir. 2021) ("[T]he Court will not consider the implications of an argument [the plaintiff] failed to make explicitly.").

Accordingly, the Detricks have not met their burden to show an agency relationship existed between Cruisers and SkipperBud's sufficient to establish privity between the Detricks and Cruisers. Thus, the Court dismisses the Detricks' breach of implied warranties claims against Cruisers (Counts X and XI).

### 2. SkipperBud's Ability to Enforce Implied Warranty Disclaimers against the Detricks

SkipperBud's argues that the implied breach of warranty claims fail because the November 2021 Agreement between the Detricks and SkipperBud's disclaimed any implied warranties with sufficiently conspicuous headings. (Doc. No. 27 at PageID#s 1187-89.) The Detricks, however, dispute that the November 2021 Agreement is the operative contract, arguing that it is no more than a "preliminary document intended to define pricing and accessories" and that SkipperBud's did not sign it. (Doc. No. 35 at PageID# 1510; Doc. No. 1-40 at PageID#s 354-57.)[24] The Detricks assert that the July 2022 Retail Installment Contract (Doc. No. 1-42 at PageID#s 367-71), which includes a

---

[24] They also note that even if it was enforceable, the disclaimer was not sufficiently conspicuous because it was in smaller than normal font, not bolded or capitalized, and located in one paragraph buried on the second page in a paragraph titled "NEW PRODUCT WARRANTIES." (Doc. No. 35 at PageID#s 1510-11.)

Service Contract and no waiver of implied warranties, is the operative contract.  (Doc. No. 35 at PageID# 1510) (citing Doc. No. 1-42 at PageID#s 367-71.)

SkipperBud's replies that the November 2021 Agreement is the operative contract because it enumerated the 54 Fly's specifications, refers to itself as an agreement, and includes a provision that by signing, the Detricks confirm that they read it.  (*Id.* at PageID# 1748.)  SkipperBud's states as a proposition of law that a "contract can be enforceable even if a party fails to sign it," citing to *Hocking Valley Cmty. Hosp. v. Cmty. Health Plan of Ohio*, 2003 WL 21904586 (Ohio App. 4th Dist. Aug. 6, 2003), *Nagle Heating & Air Conditioning v. Heskett*, 585 N.E.2d 866 (Ohio App. 4th Dist. 1990), and Ohio's Statute of Frauds.  (Doc. No. 40 at PageID# 1748-49.)  Then, it claims that the Detricks and SkipperBud's proceeded as if the November 2021 Agreement were executed because SkipperBud's manufactured and delivered the 54 Fly, and "the deposits were made as anticipated by the Purchase Agreement."  (*Id.* at PageID# 1749.)  It describes the July 2022 Retail Installment Contract as "simply a financing contract that 'does not even reference the Vessel, delivery date, any specifications, a warranty, or any other obviously critical facts relating the Vessel[.]'"  (*Id.*)  SkipperBud's submits that whether it had disclaimed implied warranties turns on whether the November 2021 Agreement is a valid contract between the parties.  (*Id.*)

The allegations of the Complaint do not establish that the November 2021 Agreement represents an operative contract.  Under Ohio law, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  Ohio Rev. Code § 1302.07(A). "[F]or a contract to be enforceable, it 'must be specific as to its essential terms, such as the identity of the parties to be bound, the subject matter of the contract, consideration, a quantity term, and a price term.'  *Faurecia Auto. Seating v.*

*Toledo Tool & Die Co.*, 579 F. Supp. 2d 967, 971 (N.D. Ohio 2008) (quoting *Alligood v. Proctor & Gamble Co.*, 594 N.E.2d 668 (1991)).  However, "[w]hen the evidence clearly shows, either by reason of definite language or otherwise, that the only (and the complete) subject matter that is under consideration is left for further negotiation and agreement, there is no contract[.]"" 1 *Corbin on Contracts* § 4.1 (2024).

Here, the Court cannot determine when the Detricks and SkipperBud's formed a contract. First, it is unclear who is even a party to November 2021 Agreement.[25]  The only signature on the November 2021 Agreement is Norm Detrick's.  (Doc. No. 1-40 at PageID# 354.)  Judy Detrick and SkipperBud's never signed the November 2021 Agreement, even though Judy Detrick is listed as a "co-buyer."  (*Id.*)

Second it is unclear what specific goods the Detricks purchased and at which prices. The Complaint alleges that in December 2021, McDonald emailed the Detricks that the "next step is to get the pricing for all the special requests.  Cruisers is supposed to get that to me after the first of the year, and then you will pick out your colors.  You should receive the swatches after the first of the year as well.  On Monday I will follow up with Cruisers on both of these issues."  (Compl. at ¶ 169.)  But the need for pricing for "all the special requests" contradicts the "2022 Cruisers Retail Order Form" attached to the November 2021 Agreement because that form already includes prices.  (*Id.* at PageID#s 356-57.)  Additionally, the overall price inexplicably increases by over $200,000 between the November 2021 Agreement and the July 2022 Retail Installment Contract.  (Doc. No 1-42 at PageID# 368; Doc. No. 1-40 at PageID# 354.)

_____

[25] The November 2021 Agreement is dated 11/21/21, but Norm Detrick's signature is dated "11/17/22."  (Doc. No. 1-40 at PageID# 354.)

Third, after November 2021, the Detricks continued negotiating the color selection of the 54 Fly throughout 2022 until Cruisers Yachts manufactured and delivered the 54 Fly.  (Compl. at ¶¶ 163-83.)  Before the "Build Process," the Complaint alleges only that the Detricks "decided to move forward with the purchase of the 54 Fly from SkipperBud's, to be manufactured by Cruisers Yachts," but not that either executed the November 2021 Agreement or ever returned the November 2021 Agreement to SkipperBud's.  (Compl. at ¶ 48.)

Fourth, while SkipperBud's maintains that "the deposits were made as anticipated by the Purchase Agreement[,]"  (*Id.* at PageID# 1749), a review of the Complaint does not show allegations that the Detricks made any payment before Cruisers began manufacturing the 54 Fly.  (Compl. at ¶¶ 15-60; *Id.* at 163-83.)  Indeed, the November 2021 Agreement appears to assume that the sale would be completed in the future because it includes a term stating, "***If the Detrick's [sic] complete this sale*** and opt to sell the boat prior to delivery, SkipperBud's will reduce the selling commission to 5% of the agreed upon selling price to the next owner."  (Doc. No. 1-40 at PageID# 356) (emphasis added). This language contemplates that at that point in time, the sale was not yet "complete."  (*Id.*)

Thus, at this stage of the litigation, it is unclear who was a party to the November 2021 Agreement, what goods the Detricks purchased, when the Detricks paid the deposit, and if so, how much they paid.  Accordingly, the Court cannot conclude that the November 2021 Agreement is the operative contract, so SkipperBud's may not enforce it to bar the Detricks' breach of implied warranty claims (Counts XII and XIII) against SkipperBud's.  Therefore, the Court declines to dismiss those claims.

### E.  Breach of Written Warranty Claim Against Kohler

In its 12(c) Motion, Kohler, the manufacturer of the 54 Fly's Generator, argues that the Detricks' breach of written warranty claim (Count XIV) fails because the Generator's improper installation voided the Limited Warranty because the Detricks continued to operate the Generator although they knew it had been improperly installed, and because the warranty excludes coverage for design defects.  (Doc. No. 36 at PageID# 1522-24.)  Kohler further argues that the Detricks failed to state a design defect claim because the Complaint does not "identify the alleged defect" in the Generator and does not allege that the defect existed when it left the hands of Kohler.  (Doc. No. 36 at PageID# 1524.)[26]  In their Brief in Opposition, the Detricks deny that improper installation voids the Limited Warranty because they do "not allege that *all* problems with the Kohler generator were solely attributable to Cruisers yachts improper installation" and because Kohler fails to point to authority supporting the proposition that improper installation renders the product not subject to or not in conformity with the warranty.  (Doc. No. 45 at PageID# 1760-70.)  As to Kohler's contention that the Detricks failed to state a design defect claim by not identifying the alleged defect and by not showing that the defect existed when the Generator left Kohler's hands, the Detricks respond that those requirements apply only to implied, not express warranty claims.  (Doc. No. 45 at PageID# 1771-72.)

---

[26] Kohler makes two other arguments which it later concedes.  It argues that a lack of privity between the Detricks and Kohler defeats a breach of *implied* warranty claim, but after the Detricks clarified that they brought only a breach of *express* warranty claim against Kohler, Kohler withdrew its privity-based argument.  (Doc. No. 36 at PageID# 1524; Doc. No. 45 at PageID# 1772; Doc. No. 55 at PageID# 1842.)  Kohler also raises the economic loss doctrine in its 12(c) Motion, however, the Detricks noted that the economic loss doctrine could bar only *tort* claims against Kohler and that the Detricks had not asserted any tort claims against Kohler.  (Doc. No. 36 at PageID# 36 1525-26; Doc. No. 45 at PageID# 1772.)  In its Reply, Kohler concedes that the economic loss doctrine applies only to tort claims, and it notes that "both sides agree that Kohler cannot be held liable for tortious or personal injury damages if it is found liable at all."  (Doc. No. 55 at PageID# 1843.)

In its Reply, Kohler expands upon its argument that the Detricks' failed to identify the Generator's defect beyond pointing to the Generator's *design* defects.  (Doc. No. 55 at PageID#s 1836-39.)  Kohler emphasizes the Detricks' failure to identify the source of the defect to underscore that, without more, a design defect is not covered by the terms of the Limited Warranty: "only materials and workmanship are warranted," Kohler, argues, not "design defects."  (*Id.* at PageID#s 1836-37).  Kohler argues that the terms of the Limited Warranty exclude coverage for *any* improper installation, even if only "some" of the issues with the Generator arose therefrom.  (*Id.* at PageID#s 1839-41.)  Lastly, Kohler argues that the Detricks' "misuse" of the 54 Fly by operating it despite awareness of the issues voided the warranty.  (*Id.* at PageID#s 1841-42.)

A valid breach of written warranty claim under Ohio law requires the plaintiff to "demonstrate that (i) the item at issue was subject to a warranty; (ii) the item did not conform to the warranty; (iii) the seller was given reasonable opportunity to cure any defects; and (iv) the seller failed to cure the defects within a reasonable time or a reasonable number of attempts."  *Kuns v. Ford Motor Co.*, 543 Fed. Appx. 572, 575-76 (6th Cir. 2013) (quoting *Temple.*, 133 Fed. Appx. at 268).

For the reasons below, the Court finds that the Detricks failed to satisfy the first element because the Generator's Limited Warranty only warrants that the Generator would be "free from defects in materials and workmanship," but not from the alleged design defects, and the Limited Warranty requires Kohler to repair or replace the Generator only if the Generator was "properly installed," and the Detricks allege precisely the opposite.[27]

---

[27]  Because the Court finds sufficient grounds to dismiss the breach of written warranty claim on other grounds, the Court need not address the fact-laden question of whether the Detricks 'misused' the Vessel.

### 1. The Limited Warranty does not cover "design defects."

"A MMWA claim fails as a matter of law if it alleges a design defect but is brought under an express written warranty covering 'materials and workmanship.'" *Szep*, 491 F. Supp. 3d at 292 (quoting *Schechner v. Whirlpool Corp.*, 237 F. Supp. 3d 601, 613 (E.D. Mich. 2017)) (Ohio law). Indeed, "[t]he overwhelming weight of state-law authority holds that design defects are not covered under a [materials or workmanship] warranty." *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 788 (E.D. Mich. 2019) (quoting *Sloan v. Gen. Motors LLC*, 2017 WL 3283998 at *8 (N.D. Cal. Aug. 1, 2017)); *see also* 3 Bruner & O'Connor, *Construction Law* § 9:64 (2024) (same).  The key is that a defect in a product's 'material and workmanship' is distinct from a defect in that product's 'design.' The Sixth Circuit has contrasted these three categories of defects under Ohio law, describing a "defect in material" as a "defect in quality" while "a defect in workmanship is a defect in the way some part of the machine is constructed." *Lombard Corp. v. Quality Aluminum Prods. Co.*, 261 F.2d 336, 338 (6th Cir. 1958).  "Design, on the contrary, involves the overall plan of construction and operation." *Id.*  As one court put it, the distinction between a defect in 'design' and in 'material' and 'workmanship' comes down to the "plain meaning of common English words," because:

> '[d]esign' refers to 'the arrangement of elements that make up a machine,' and 'the process of selecting the means and contriving the elements, steps, and procedures for producing what will adequately satisfy some need.'  Thus, the process of selecting and arranging the component parts of the Vehicle clearly implicates the Vehicle's design. The terms 'material,' 'workmanship,' or 'factory preparation,' on the other hand, refer to the mechanical process of implementing that design.

*Cali v. Chrysler Grp. LLC*, 2011 WL 383952 at *2 (S.D.N.Y. Jan. 18, 2011), *aff'd*, 426 Fed. Appx 38 (2d Cir. 2011) (citations omitted).

Here, the Limited Warranty only warrants "each product to be free from defects in materials and workmanship," but does not warrant that the Generator would be free from *design* defects.  It provides:

> Your Kohler product has been manufactured and inspected with care by experienced craftsmen.  If you are the end user, Kohler Co. warrants, for the period indicated below, each product to be **free from defects in materials and workmanship**. Repair, replacement, or appropriate adjustment at Kohler Co.'s option will be furnished if the product, upon Kohler Co.'s inspection, is found to be properly installed, maintained, and operated in accordance with Kohler Co.'s instruction manuals.  This warranty does not apply to malfunctions caused by damage, unreasonable use, misuse, repair or service by unauthorized persons, or normal wear and tear.

(Doc. No. 1-37 at PageID# 347) (emphasis added).  In contrast, the Detricks repeatedly allege only design defects:

306.  The 54 Fly's generator was manufactured and warranted by Kohler.  A true and accurate copy of the Kohler warranty is attached as Exhibit 37.

307.  The Kohler generator overheated on at least 40 occasions since delivery of the 54 Fly, causing irreparable damage to its performance, dependability, and longevity.

308.  The Kohler generator's impellors had to be replaced at least 10 times since delivery of the 54 Fly.

309.  The intake and plumbing system connected to the Kohler generator is **defectively designed** and results in repeated overheating of the generator.

310.  Cruisers Yachts improperly installed the Kohler generator, including upside down placement of the exhaust tube.

311.  Upon information and belief, **the problems experienced related to the Kohler generator's malfunctions are caused by a design and engineering problem that affects other Cruisers Yachts' vessels in the Cantius line**.

312.  **A reliable generator system, designed to be used while underway**, is essential to the Detricks in order to consistently operate air conditioners and refrigerators that are essential to managing Judy Detrick's health condition (multiple sclerosis).

(Compl. at ¶¶ 306-12) (emphasis added).

The court in *Szep* held similar allegations to constitute a design defect not covered by a warranty against materials and worksmanship defects. *See* 491 F. Supp. at 292. In *Szep*, the plaintiff alleged that General Motors installed a Generation IV 5.3 Liter V8 Vortec 5300 Engine in his 2011 Chevrolet Silverado "and other model year 2010 through 2014 General Motors Corporation ("GMC") and Chevrolet Vehicles[,]" which the court collectively referred to as the "Class Vehicles." *Id.* Although his theory of liability was that the engine contained an oil consumption defect, the plaintiff did "not allege facts indicating that the oil consumption defect is related to a flaw in materials or workmanship. To the contrary, the Complaint states that the oil consumption defect *is an inherent defect in each of the Class Vehicles and that the design of the Gen IV Engines* caused excessive oil consumption. Notably, these types of allegations concern a defect in design." *Id.* at 292. The Detricks' allegations state the same kind of claim by pointing to a "design and engineering problem that affects other Cruisers Yachts' vessels in the Cantius line." (Compl. at ¶ 311.) That is precisely the kind of "inherent defect" in the product class which *Szep* found unactionable as merely a "defect in design." *Id.* at 292.

Consequently, the Court finds that Kohler is correct that the Detricks failed to plead that the Generator's "materials" or "workmanship" were insufficient, and therefore, the defects as alleged in the Complaint are not subject to the Limited Warranty. (Doc. No. 55 at PageID# 1837.)

### 2. The Limited Warranty does not cover generators found not to be "properly installed."

"Principles of contract interpretation apply when interpreting warranty provisions." *Scott v. Ford*, 2021 WL 303821 at *4 (Ohio App. 8th Dist. Jan. 28, 2021) (citing *Nee v. State Indus., Inc.*, 3 N.E.3d 1290, 1300 (Ohio App. 8th Dist. 2013)). "Under Ohio law, the interpretation of written

contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008).  "If the agreement's text is unambiguous, our interpretive task also ends with the text, and we apply the agreement as written." *Diamond Transp. Logistics, Inc. v. Kroger Co.*, 101 F.4th 458, 462 (6th Cir. 2024) (quoting *City of St. Marys v. Auglaize Cnty. Bd. of Commrs.*, 875 N.E.2d 561, 566 (Ohio 2007)).  "Where the terms in an existing contract are clear and unambiguous, this court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Savedoff*, 524 F.3d at 763 (quoting *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978)).

The Limited Warranty provides that "[r]epair, replacement, or appropriate adjustment at Kohler Co.'s option will be furnished if the product, upon Kohler Co.'s inspection, is found to be *properly installed*, maintained, and operated in accordance with Kohler Co.'s instruction manuals." (Doc. No. 1-27 at PageID 347; Doc. No. 36 at PageID# 1523) (emphasis added).  Kohler interprets this language to mean that the Generator is subject to the Limited Warranty "*only if* the product is inspected by Kohler and is found to be properly installed[.]"  (Doc. No. 36 at PageID 1523.)

Kohler's 12(c) Motion directs the Court to four of the Detricks' allegations that it contends establish that the Generator was improperly installed.  (Doc. No. 36 at PageID# 1519.)  These include the allegations that "[a]t the outset of the Great Loop trip, the Detricks learned that Cruisers Yachts had failed to apply necessary protective coatings to newly installed sea strainers and engine pickups, which contributed to the engines and generator overheating[,]" "[w]hen Cruisers Yachts took control of the 54 Fly in Atlantic City, the Detricks discovered the failure of the Propspeed protective coatings on the propellors," and that "[t]he Detricks paid to have the generator repaired, including the exhaust

70

tube that had corroded due to being installed upside down by Cruisers Yachts." (Compl. at ¶¶ 105, 127, 316.)  Critically, the Detricks allege the following: "Cruisers Yachts *improperly installed the Kohler generator*, including upside down placement of the exhaust tubes." (*Id.* at 310.)  From this, citing *Temple*, Kohler concludes that the Detricks fail to establish the first element of a breach of warranty claim requiring that the product be "subject to a warranty."  133 Fed. Appx. at 268.

Kohler is correct.  The Detricks attempt to resist this conclusion by arguing that Kohler's logic mistakenly assumes that the Detricks attribute *all* defects to Cruiser's improper installation. However, that is not what Kohler argues, and that is not what the Limited Warranty requires.  (Doc. No. 45 at PageID# 1768).  As Kohler underscores in its Reply, "the limited warranty bars all claims where the generator has been improperly installed" even where that improper installation only caused "some" of the issues with the Generator.  (*Id.* at PageID#s 1839-41.)  The reason is simple: the plain text of the Limited Warranty creates a necessary precondition to Kohler's obligation to repair or replace the Generator: that it be "found to be properly installed[.]"  (Doc. 1-37 at PageID# 347.)  But the Detricks pled that "Cruisers Yachts improperly installed the Kohler generator[.]"  (*Id.*; Compl. at ¶ 310.)  That precondition to coverage therefore fails, so the Limited Warranty does not cover the Generator.

The Detricks also try to distinguish *Temple* and emphasize Kohler's lack of legal authority for its position that improper installation voids a warranty. The Detricks accurately note that in *Temple*, the court predicated its holding on the plaintiffs' failure to demonstrate engine defects.  *See* 122 Fed. Appx. at 270 ("[T]he Temples cannot show that there existed any continued engine problems after August 2001, and this failure is still a fatal flaw in their breach of warranty and Magnuson-Moss

Act claims against Cummins.").[28]  True, *Temple*'s holding does not rest on the improper installation of the plaintiffs' engine, but Kohler merely cited *Temple* for the four-pronged breach of warranty standard, not to factually analogize it to this case.  (Doc. No. 36 at PageID# 1519-23.)  Indeed, in its Reply, Kohler acknowledges that neither side has presented any legal authorities demonstrating that improper installation voids a warranty, because "no other plaintiff has sued upon an express warranty that excludes coverage for improper installation and then included that very allegation elsewhere in the complaint."  (Doc. No. 55 at PageID# 1840.)

For that reason, the basic rules of contract interpretation control this result.  A "court may not 'rewrite the parties' contract' to give it a meaning other than and/or beyond that expressed in its unambiguous language." *McClusky v. Century Bank, FSB*, 598 Fed. Appx. 383, 387 (6th Cir. 2015). So, if, as here, an express warranty covers a product only if a certain requirement is satisfied, and the plaintiff explicitly pleads that the requirement was not satisfied, then the plaintiff cannot assert a claim for breach of that warranty.

Accordingly, because the Limited Warranty only covers "defects in materials and workmanship" and not design defects, and because the Detricks plead that Cruisers improperly installed the Generator when proper installation was a necessary precondition for coverage under the Limited Warranty, the Court finds that the Detricks have failed to establish that the Generator is

---

[28] The Detricks are also correct that *Temple* decided a motion for summary judgment rather than a motion at the pleadings stage, but that distinction is legally irrelevant.  When a court evaluates a case at the summary judgment stage, it treats undisputed facts the same way it treats allegations in the complaint at the pleading stage—by assuming them to be true before applying the law. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law"); *Iqbal*, 556 U.S. at 678 ("for the purposes of a motion  to dismiss we must take all of the factual allegations in the complaint as true[.]").

"subject to" the Limited Warranty, and therefore, have failed to state a claim against Kohler for "breach of written warranty" (Count XIV).

### F.  Claims Against Jet Thruster

#### 1.  Breach of Contract

In its Motion to Dismiss, Jet Thruster, the installer of the "bow and stern thrusters in the 54 Fly," argues that the Detricks' breach of contract claim (Count XVI) "fails to state a cause of action against Jet Thruster for breach of contract."  (Doc. No. 54-1 at PageID# 1826-28.)  While scattered throughout its Motion, Jet Thruster appears to make two arguments.  First, it argues that the breach of contract claim fails because the Complaint "fails to state the most basic information concerning the purported agreement between Plaintiffs and Jet Thruster, like whether the agreement with [the Detricks] was written or verbal, and the terms of the agreement."  (*Id.* at PageID# 1825-26.)  After reciting the Rule 12(b)(6) standard of review and citing authority that contracts require "offer acceptance, and consideration" under Ohio law, Jet Thruster concludes that the Detricks' allegation that "Jet Thruster entered into a valid and enforceable contract with the Detricks to install bow and stern thrusters in the 54 Fly" is insufficient because the Detricks "fail to provide any information as to the terms of the contract, as well as the most basic information regarding whether the contract was oral or written."  (*Id.* at PageID# 1828.)  Second, Jet Thruster argues that "there are no allegations in the Complaint that Jet Thruster failed to install the bow and stern thrusters in accordance with the drawings provided" or that Jet Thruster was obligated to install or re-install other components.  (*Id.* at PageID# 1826.)[29]  The Detricks' Brief in Opposition refutes Jet Thruster's contention by pointing

---

[29] Jet Thruster appears to have considered including another argument when it wrote, "the Complaint fails to state adequate factual content like whether the purported agreement between Plaintiff and Jet Thruster was written and verbal and

directly to the allegations of their Complaint where they alleged the elements of a breach of contract claim under Ohio law.  (Doc. No. 56 at PageID#1849.)  Jet Thruster did not rebut these arguments because it did not file a Reply.

"To establish a breach of contract claim, a plaintiff must prove (1) the existence of a contract, which requires an offer, acceptance, and consideration; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff."  *Kirkland v. St. Elizabeth Hosp. Med. Ctr.*, 34 Fed. Appx. 174, 178 (6th Cir. 2002) (citing *Nilavar v. Osborn*, 711 N.E.2d 726, 732 (Ohio App. 2d Dist. 1998)); *see also New Lansing Gardens Hous. Ltd. P'ship v. Columbus Metro. Hous. Auth.*, 46 F.4th 514, 520 (6th Cir. 2022); *Savedoff*, 524 F.3d at 762.  "In order to prove a breach by the defendant, a plaintiff must show that the defendant 'did not perform one or more of the terms of a contract.'"  *Jarupan v. Hanna*, 878 N.E.2d 66, 73 (Ohio App. 10th Dist. 2007) (quoting *Little Eagle Props. v. Ryan*, 2004 WL 1607045 at *4 (Ohio App. 10th Dist. June 30, 2004)).  While "[a] meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract[,]"  the "[t]erms of an oral contract may be determined from 'words, deeds, acts, and silence of the parties.'"  *Res. Title Agency, Inc. v. Morreale Real Est. Servs.*, 314 F. Supp. 2d 763, 769 (N.D. Ohio 2004) (quoting *Kostelnik v. Helper*, 770 N.E.2d 58 (2002)) (internal citation omitted).

Additionally, plaintiffs generally are "not required to attach to the complaint documents upon which his action is based[.]" *Sollenberger v. Sollenberger*, 173 F. Supp. 3d 608, 618 (S.D. Ohio 2016); *Bihn v. Fifth Third Mortg. Co.*, 980 F. Supp. 2d 892, 898 (S.D. Ohio 2013) (same); *Composite Techs., L.L.C. v. Inoplast Composites SA DE CV*, 925 F. Supp. 2d 868, 873 (S.D. Ohio 2013) (same).

---

whether"—but Jet Thruster's Motion does not complete the sentence following the "and whether[.]"  (*Id.* at PageID# 1827.)

That is because Fed. R. Civ. P. 10(c), which provides that a "copy of any written instrument that is an exhibit to a pleading is a part of the pleading for all purposes" is "permissive, and a plaintiff is under no obligation to attach to his complaint documents upon which is action is based." *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (citing 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1327 (2d ed. 1990)).

The Detricks have sufficiently alleged the elements to state a claim for a breach of contract. First, the Detricks plead the existence of the contract several times throughout their Complaint.  For example, they allege that "in or around August and September 2022, the Detricks, with the cooperation and approval of Cruisers Yachts and SkipperBud's, arranged for the installation of bow and stern thrusters by Jet Thruster to remedy defects with the 54 Fly's joystick system," that Jet Thruster was "the company hired by Detricks to install the bow and stern thrusters[,]" that "[t]he Detricks entered into a contract with Jet Thruster to install the bow and stern thrusters[,]" referencing Exhibit 1-34 as a "true and accurate copy of the Jet Thruster invoice," that "[t]he Detricks arranged and paid for installation of the bow and stern thrusters by Jet Thruster to remedy defects with the 54 Fly's joystick system," and that "Jet Thruster entered into a valid and enforceable contract with the Detricks to install bow and stern thrusters in the 54 Fly."  (Compl. at ¶¶ 67, 199, 202, 217; 675; Doc. No. 1-34).

Contrary to Jet Thruster's conclusory assertion that the Detricks "fail to provide any information as to the terms of the contract" (Doc. No. 54-1 at PageID# 1828), the invoice (the "Invoice") attached to the Complaint contains highly specific details regarding the amount of labor Jet Thruster used, the precise equipment it installed, and the exact price and quantity of those items. (Doc. No. 1-34 at PageID# 331.)   The Invoice shows that Jet Thruster performed "Labor" by

"install[ing] 2 independent systems one in bow and one in stern" for a "price" of $6,200.00.  (*Id.*)  It also shows payment due for at least six (6) other items, a "JT-90 Pump Assembly 48v[,]" "JT-70/90 Installation Kit Single[,]" "Anode Kit JT-70/90[,]" "I-401-50 Wireless Combi[,]" "Pressure Hose[,]" and a "Domestic Hardware[,]" with line-by-line descriptions of and pricing for each of the items. (*Id.*)  The Invoice is dated August 29, 2022, calculates the total value of the items to be $27,617.26, reflects a $7,683.08 payment made on August 30, 2022, using a MasterCard ending in -9537, and includes a total payment of $19,934.18 due by September 21, 2022.  (*Id.* at PageID# 331-32.)  The Invoice shows Jet Thruster's "acts" and "deeds," which, if the Detricks did not execute a written contract, would be sufficient to establish the terms of an oral contract.  *See Res. Title Agency, Inc.*, 314 F. Supp. 2d at 769; *Kostelnik*, 770 N.E.2d at 61.  Thus, whether the contract was written or oral does not change the fact that the Detricks have pled the essential terms of the contract—that Jet Thruster would install the bow and stern thrusters, and the Detricks would compensate them for the labor and materials.  (Doc No. 1-34 at PageID# 331-32.)

The Detricks additionally plead that they "performed their contractual obligations."  (Compl. at ¶ 676.)  And they plead that Jet Thruster breached the contract because it did not "appropriately staff the installation job, did not complete the installation work," "negligently and unnecessarily drilled a 3-4 inch hole in the hull below the waterline," "unnecessarily drilled two additional holes in the hull," "failed to install a wired switch as agreed upon by the parties, and instead provided  a wireless switch that does not function properly," "improperly wired batteries," that Jet Thruster's "technician left before the installation project was complete," and that "Jet Thruster did not complete the entirety of the installation, including failing to complete substantial portions of the electrical wiring, reinstallation of the shower/gray water pump, repair of leaks related to the front hose flanges,

and improperly placed batteries." (Compl. at ¶¶ 203-10.) Thus, even if Jet Thruster's assertion that there "are no allegations in the Complaint that Jet Thruster failed to install the bow and stern thrusters in accordance with the drawings provided" were true, each of those other allegations explains in detail how Jet Thruster failed to perform at least "one or more of the terms of [the] contract" and thereby breached it. *See Jarupan*, 878 N.E.2d at 73; *Little Eagle Props.*, 2004 WL 1607045 at *4.

Finally, the Detricks allege damages in the form of the "costs for other technicians to complete the installation and repair the damages caused by Jet Thruster" mistakenly drilling unnecessary holes into the 54 Fly. (Doc. No. 56 at PageID 1850) (citing Compl. at ¶¶ 204, 206, 211, 212.) Thus, the contract damages flowing from the breach are the allegations that "SkipperBud's technicians performed the portions of the installation not completed by Jet Thruster, and their work was paid for by the Detricks." (Compl. at ¶ 212.)

Accordingly, the Court finds that contrary to Jet Thruster's conclusory assertion that the Complaint fails to "provide any information as to the terms of the contract," the Detricks provided enough information to state their claim for a breach of contract (Count XVI) against Jet Thrusters.

### 2. Breach of the Implied Warranty of Workmanlike Performance

In its Motion to Dismiss, Jet Thruster also argues that the Detricks' breach of implied warranty of workmanlike performance claim (Count XVII) fails. It advances two core arguments.[30] First, Jet

---

[30] Jet Thruster also makes three other small arguments in this section. First, Jet Thruster asserts that the Detricks provided Jet Thruster with drawings to guide the installation, and that the holes Jet Thruster drilled conformed to those drawings. Second, Jet Thruster asserts that "there is no evidence that labor [regarding issues with wiring and installation of pumps, repairs of leaks, and the placement of batteries are] related to the installation of bow and stern thrusters[.]" Third, Jet Thruster submits that although the Detricks allege that Jet Thruster failed to "install a wired switch as agreed upon[,]" the Invoice "included a wireless switch." (*Id.* at PageID# 1829.) Regarding the first two assertions, whether Jet Thruster "drilled holes in accordance with the instructions and drawings they were provided with" or whether the installation of certain pumps, the placement of batteries, and the repair of leaks "relates" to the "installation of bow and stern thrusters" require fact-intensive evaluation, and Jet Thruster has advanced no argument and cited no authorities so as to enable the Court to decide those issues as a matter of law. (*Id.*) Regarding its conclusory assertion that the Invoice includes a

Thruster contends that "Jet Thruster's Terms and Conditions, which control the rights and responsibilities between the Parties, explicitly disclaim the warranty of workmanlike service" citing to "Jet Thruster's Terms and Conditions, attached hereto as Exhibit 'A.'" (Doc. No. 54-1 at PageID# 1826.) Second, it argues that under Ohio common law, the warranty of performance in a workmanlike manner does not apply to Jet Thruster because it is "not a building contractor." (*Id.* at PageID# 1829-30.) In their Brief in Opposition, the Detricks rebut the first argument by pointing out that Jet Thruster failed to attach the Terms and Conditions as an exhibit to its Motion. (Doc. No. 56 at PageID# 1849.) The Detricks rebut Jet Thruster's claim to exclusion from the implied warranty of workmanlike performance on account of its status as a non-builder by pointing out that admiralty law implies the warranty "in every maritime repair contract and other maritime services contracts, unless the parties' agreement expressly excludes it." (Doc. No. 56 at PageID# 1851.) As noted above, Jet Thruster did not file a Reply so as to counter this assertion.

First, a review of the docket indicates that the Detricks are correct— Jet Thruster neglected to include any document titled "Exhibit A" or "Terms and Conditions" to its Motion. (Doc. No. 54-1.) Thus, the Court cannot conclude that the "Terms and Conditions" to which Jet Thruster alludes disclaimed the implied warranty of workmanlike performance. Second, Jet Thruster's and the Detricks' competing reliance on Ohio law and federal admiralty law respectively requires the Court to resolve the threshold determination as to which law applies. (Doc. No. 54-1 at PageID# 1829;

---

wireless switch in contradiction of paragraph 207 of the Complaint, Jet Thruster misses the point.  The Detricks' allegation is that even though the parties "agreed" to install a "*wired* switch," Jet Thruster actually installed a *wireless* switch as demonstrated by the Invoice and in contravention of that agreement.  (Compl. at ¶ 207; Doc. No. 1-34) (emphasis added). The difference between the agreement the Detricks allege the parties made and Jet Thruster's alleged conduct is the basis for the Detricks claims, not, as Jet Thruster suggests, a refutation of them.

Doc. No. 56 at PageID# 1851-52.)  However, neither Jet Thruster nor the Detricks explains why this Court should apply Ohio law or admiralty law.

"Whether a contract cause of action is within the Court's admiralty jurisdiction depends on whether 'the services actually performed pursuant to the contract are maritime in nature.'" *Martin v. O-N Minerals (Michigan) Co.*, 2009 WL 322045 at *2 (E.D. Mich. Feb. 10, 2009) (quoting *Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 612 (1991)).[31]   Both the Sixth Circuit and the Supreme Court have explained that "contracts to repair or insure a ship are maritime in nature."  *Fitch v. Gilbert*, 1987 WL 38167 at *2 (6th Cir. Oct. 23, 1987) (citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961)).   And the Sixth Circuit has also noted that "suing on the [implied warranty of workmanlike service] is a contract action[.]"  *Oblebay Norton Co. v. CSX Corp.*, 788 F.2d 361, 364 (6th Cir. 1986).  Thus, because the contract between the Detricks and Jet Thruster was to install "bow and stern thrusters . . . to remedy defects with the 54 Fly's joystick system" (Compl. at ¶ 67), the breach of implied warranty of workmanlike performance here arises under this Court's admiralty jurisdiction because Jet Thruster's performance consisted in repairing the 54 Fly's joystick system. *See Fitch*, 1987 WL 38167 at *2; *Kossick*, 365 U.S. at 735.  As the Detricks point out, "[g]eneral maritime law requires that a contractor perform repairs in a workmanlike manner." *De Carli v. Crusoe's Rivertown Motors, Inc.*, 1995 WL 620964 at *4 (6th Cir. 1995) (citing *Little Beaver Enters. v. Humphrey Rys., Inc.,* 719 F.2d 75, 77-78 (4th Cir. 1983)).  The Court in *De Carli* expressly noted that the warranty applies to ship repairers:

> The warranty is breached where repair jobs are improperly performed, where efforts intended to prevent damage to a ship have been ineffective and where the equipment

---

[31] Article III of the U.S. Constitution vests federal courts with the judicial power, which extends to "all Cases of admiralty and maritime jurisdiction."  U.S. CONST., art. III, § 2.  Congress extended the original jurisdiction of federal courts to any "civil case of admiralty or maritime jurisdiction."  28 U.S.C. § 1333(1).

chosen for a specific purpose is defective or unsafe.  The warranty of workmanlike service does not, however, make the repairer a guarantor of the results of the repair.

*De Carli*, 1995 WL 620964 at *4 (applying maritime law to ship repairer and holding that the plaintiffs failed to "carry their burden in proving that Anchor In's repairs were unworkmanlike and that the boat sank because of the failure in the repaired sections.").

Accordingly, the Court concludes that federal admiralty law applies to the Detricks' breach of warranty of workmanlike performance claim (Count XVII) and that therefore the implied warranty applies to Jet Thruster as a contractor hired by the Detricks to repair the 54 Fly.  Thus, the Court declines to dismiss this claim.

## V.  Conclusion

For the foregoing reasons, the Joint Motion of the Cruisers-SkipperBud's Defendants (Doc. No. 27) is GRANTED in part and DENIED in part as follows: the Court dismisses Counts III, IV, V, VI, VII, X, XI, XIV, and XV with prejudice.  Kohler's Motion (Doc. No. 36) is GRANTED, and Jet Thruster's Motion (Doc. No. 54) is DENIED.

Accordingly, because the Court has not dismissed the Detricks' claims against Defendants Cruisers (Counts I, IX),[32] SkipperBud's (Counts II, VIII, XII, XIII), and Jet Thruster (Counts XVI, and XVII), Defendants Cruisers, SkipperBud's, and Jet Thruster  remain as Defendants in this action. Because the Court dismisses the Detricks' only claims against Defendants Pedersen (Count V), Zenz (Count VI), Riepe (Count VII), Kohler (Count XIV), and Ferfecki (Count XV), Defendants Pedersen, Zenz, Riepe, Kohler, and Ferfecki are hereby DISMISSED from this action.

---

[32] The Court does not dismiss Count IX for breach of written warranty against Cruisers because Cruisers did not move to dismiss this claim.

**IT IS SO ORDERED.**

            *s/Pamela A. Barker*
            PAMELA A. BARKER
Date:  April 17, 2025         U. S. DISTRICT JUDGE